No. 21,526.

THE STATE OF KANSAS, *Appellee,* v. L. F. WILSON, *Appellant.*

SYLLABUS BY THE COURT.

1. TRADING STAMPS — *Construction of Statute — License Tax.* Trading stamps supplied by a stamp company to a retail merchant, under an agreement on his part that he is "to offer them to all cash customers when making purchases and when accepted give to his said cash customers one of said stamps for each ten cents represented in such payment, as a discount for cash," are to be regarded as used "in, with, or for" the sale of goods, within the meaning of a statute requiring the payment of a license tax by any one furnishing stamps to be used in that manner.

2. SAME. In a provision of such a statute, exempting from its operation the furnishing of stamps "redeemable at their face value, in cash or merchandise from the general stock of said merchant at regular retail prices at the option of the holder thereof," the phrase "said merchant" refers to the dealer to whom the stamps are furnished, and not to the concern furnishing them, the stamps being redeemable by that concern in cash or out of a special stock of goods kept and used by it only for that purpose.

3. SAME—*Prohibitory License Tax—Power of Legislature.* In the case of a business which the state under its police power has a right to prohibit on the ground that it is injurious to the public, the legislature may exact as a requirement to its continuance the payment of a license tax so large as to be practically prohibitory.

4. SAME—*Objections to Use of Stamps.* Objections to trading stamps on public grounds are not so obviously unreasonable as to warrant a court in holding void a statute prohibiting their use.

5. SAME—*Issued to Cash Customers Only—Power of Legislature.* A trading-stamp device is not placed beyond legislative prohibition by the fact that the stamps are issued only to cash customers, and not to those purchasing on credit.

6. SAME—*Method of Redemption—Not Discriminative.* A statute imposing a license tax upon the use of trading stamps is not rendered void, as involving an unreasonable discrimination, by the fact that it does not apply where the stamps are redeemable in goods from the general stock of the merchant using them.

7. SAME—*Stamps Sold for Use in Another County.* The validity of a section of the anti-trading-stamp act relating to stamps sold for use in another county held not to be involved.

8. SAME — *"Uniformity of Assessment" — No Application to Trading-stamp Act.* The provisions of the state constitution regarding uniformity of assessment and the statutory statement of the object of a tax do not apply to license taxes.

Appeal from Shawnee district court, division No. 1; ALSTON W. DANA, judge. Opinion filed November 10, 1917. Affirmed.

*J. S. Dean,* and *A. M. Harvey,* both of Topeka, for the appellant; *Frank T. Wolcott,* of New York, N. Y., of counsel.

*S. M. Brewster,* attorney-general, and *Robert D. Garver,* county attorney, for the appellee; *James A. Troutman,* of Topeka, of counsel.

*C. W. Burch, B. I. Litowich,* and *LaRue Royce,* all of Salina, as *amici curiæ.*

The opinion of the court was delivered by

MASON, J.: L. F. Wilson appeals from a conviction upon a charge of violating the provisions of the act relating to the use of trading stamps. (Laws 1917, ch. 331.) The case was determined by the trial court upon an agreed statement of facts supplemented by a few affidavits. The appellant is an agent of the Sperry & Hutchinson Company, and his contention is that the operations of that company are not within the prohibition of the statute as properly construed; and that if the statute is given such construction as to impose a penalty upon him, it is invalid.

The statute (§ 1) forbids any one who has not obtained a license, by the payment of a fee graded according to the population of the county (in this instance $6,000) to—

"furnish to any other person, firm or corporation to use *in, with or for the sale of any goods*, wares or merchandise, any stamps, coupons, tickets, certificates, cards, or other similar devices, which shall entitle the purchaser receiving the same with such sale of goods, wares or merchandise to procure from any person, firm or corporation any goods, wares or merchandise, free of charge, or for less than the retail market price thereof, upon the production of any number of said stamps, coupons, tickets, certificates, cards or other similar devices."

An exception is made, however, by the terms of which the act does not apply to—

"the furnishing or issuance of any stamps, coupons, tickets, certificates, cards or other similar devices redeemable at their face value, in cash or merchandise *from the general stock of said merchant* at regular retail prices at the option of the holder thereof."

The appellant maintains that the stamps of his company are not furnished for use "in, with, or for the sale of any goods," and that the transactions of the company are within the terms of the exception.

1. As shown by the agreed statement, the Sperry & Hutchinson Company furnished to a firm of retail merchants in Topeka "trading stamps" which were redeemable in cash or merchandise, at the election of the holder, but only at the "premium parlor" maintained by the stamp company, where goods were kept for that purpose, and not for sale for cash or other disposition. The merchants receiving them agreed:

"To offer said stamps to all cash customers when making purchases and when accepted give to . . . said cash customers one of said stamps for each ten cents represented in such payment, as a discount for cash."

In behalf of the appellant it is argued that inasmuch as the stamps are given to a customer only as a discount for a cash payment they are not used "in, with, or for" the sale of the goods. We regard the argument as unsound. While the stamps are allowed only to customers who pay cash, and an important purpose in their use is to promote prompt payment, it is clear that they also serve as an inducement to buy—they are a part of what the buyer gets for his money, and as they must be offered to all cash customers *when making purchases,* they are used "in, with, or for" cash sales within the letter as

well as within the spirit of the act. If they were given only for the payment within a fixed time of indebtedness which had already been incurred, an entirely different question would be presented. The circumstance that they are not used in connection with all sales does not affect the application of the statute.

2. It is also argued in behalf of the appellant that the statute being penal is required to be strictly construed in his favor, and that by virtue of that rule it is permissible to interpret as referring to his company the words "said merchant" in the provision allowing stamps to be furnished without the payment of the license tax, if they are redeemable "from the general stock of said merchant." We do not think the statute fairly susceptible of that interpretation. The word "merchant" had not previously been used in the act, but the language already quoted shows that the subject of the legislation is the furnishing of stamps by one person to be used by another in connection with sales of merchandise made by the latter, who is the one to whom the term "merchant" naturally applies. Moreover, the goods in a "premium parlor" can hardly be regarded as the general stock of a merchant, since they are kept merely for delivery in exchange for stamps, and not for ordinary sale.

3. The conviction must therefore be sustained unless the statute as we have construed it is open to some constitutional objection which the defendant is in a position to urge. He asserts that the tax which his company would be required to pay under this construction in order to continue in business is absolutely prohibitory. It may be doubted whether the evidence clearly shows this to be the case, but that matter need not be gone into. The tax is so large as to indicate that at least a repressive effect was intended, and as the legal question would be substantially the same in one case as in the other, it will be assumed for the purpose of the appeal that the necessary effect of its enforcement would be to bar the stamp company from operating in the state under its present system.

An ordinance enacted merely under statutory authority to impose license taxes, supplemented by a general grant of power to legislate for the welfare of the city, will be held unreasonable and void if it is manifestly in excess of the needs

of the municipality and out of proportion to other taxes.
(*Scriven v. City of Lebanon,* 99 Kan. 602, 162 Pac. 307.)  But
a city ordinance, except where it conforms strictly to an ex-
press and specific legislative grant, is far more amenable to
judicial supervision than a statute.  (6 R. C. L. 244; 28 Cyc.
370; 2 Cooley on Taxation, 3d ed., 1140.)  The amount of tax
which may be imposed upon the right to engage in an ordi-
nary, useful, harmless business is limited, and the power of
the legislature itself in that regard is sometimes said to be
confined within very narrow bounds.  (25 Cyc. 611.)  But in
the case of an occupation which is injurious or offensive to the
public, these limitations do not apply.  As such an occupation
may be prohibited altogether, it may be allowed upon such
terms as the law-making body sees fit to impose.  It may be
suffered to exist, on condition of the payment of a burden-
some tax, designed to have a repressive effect (2 Cooley on
Taxation, 3d ed., 1125; Gray on Limitations of Taxing Power,
§ 1452; Tiedeman's Limitations of Police Power, pp. 277, 278),
or practical prohibition may be accomplished indirectly by
imposing a tax so large as to prevent its being carried on ex-
cept at a financial loss, thus taxing it out of existence.  (2
Cooley on Taxation, 3d ed., 1133, 1134; 21 A. & E. Encycl. of
L. 778; *State v. Pitney,* 79 Wash. 608; *Pitney v. Washington,*
240 U. S. 387.)

(See, also, *City Council of Montgomery v. Kelly,* 142 Ala.
552; *Schmidt v. City of Indianapolis,* 168 Ind. 631; Note, 30 L.
R. A. 415.)

"It is only important to distinguish between licenses issued by way of
regulation and licenses issued for purposes of revenue, in the case of
municipal corporations acting under legislative authority.  The question
then is, For what object was the authority given by the legislature?  Such
an inquiry is irrelevant in testing the validity of a statute of the state."
(*Allyn's Appeal,* 81 Conn. 534, 538.)

4.  A more difficult question is whether the business of the
trading-stamp company is of such character that it may be
forbidden.  On this subject there is a direct conflict in the de-
cisions, and the numerical weight of authority still favors a
negative answer.  Until recently the great preponderance of
expressed judicial opinion was to the effect that plans of the
general character of that here involved, for the giving of
stamps redeemable in merchandise as an inducement to in-

creased sales, were not open to any objection on public grounds, and were beyond the reach of discriminatory legislation. It is said in a recent law review that up to March, 1916, there had been something over fifty decisions of state and federal courts against the validity of anti-trading-stamp statutes, and but two or three to the contrary; that two hundred or more judges of appellate courts had held that such legislation infringed the national constitution. (20 Law Notes, 161.) Prior to that time the only courts upholding such legislation were those of the District of Columbia and the state of Washington (Note, L. R. A. 1917A 433), the latter by overruling an earlier decision. (*State v. Pitney,* 79 Wash. 608.) The question principally considered in most of the cases on the subject, however, was whether the trading-stamp device amounted to a lottery; and in a number of them the law attacked was a city ordinance not supported by an express statute. Moreover, the earlier decisions on the subject were made at a time when the police power of the state was regarded as much more restricted in its scope than accords with present-day conceptions, and the later decisions were influenced by those already made. For illustration, in a typical instance the matter was thus treated:

"We come, then, to the question whether the act before us is one which falls within the police power of the legislature; for, if it is not, it is clearly an unlawful interference with private right. We will endeavor to test this question by the simple process of elimination. First, then, Does said act look to or in any manner concern the public health? No one claims that it does, and no one could for a moment claim with any basis of reason that it has, or was intended to have, even the remotest bearing thereon. Second, Does the act look to or tend to promote the public safety? Nothing of this sort, either, is claimed in its favor, and we fail to see that anything could be, for it bears no relation whatsoever thereto. Having thus eliminated two of the general grounds upon which said act must be supported as being a valid exercise of the police power, we come to the third and last one, which raises the question whether the act relates to or tends to promote the public morals." (*State v. Dalton,* 22 R. I. 77, 82.)

The assumption that the police power extends only to the protection of the health, safety and morals of the public, which was at one time quite general, is now out of date. The modern view is that the state may control the conduct of individuals by any regulation which upon reasonable grounds can be re-

garded as adapted to promoting the common welfare, convenience, or prosperity. (6 R. C. L. 203, 204.)

On March 6, 1916, two statutes, quite similar to those which had been so generally condemned, were upheld by the federal supreme court in a series of unanimous opinions, on the ground that they were enacted under a proper exercise of the police power, and that the decision of a legislative body that the use of trading stamps is harmful to the public is not subject to judicial review. (*Rast v. Van Deman & Lewis*, 240 U. S. 342; *Tanner v. Little*, 240 U. S. 369; *Pitney v. Washington*, 240 U. S. 387.)

These decisions are of course conclusive so far as concerns any of the guaranties of the constitution of the United States, and are highly persuasive with respect to similar provisions of state constitutions. Since they were announced the Massachusetts court of last resort has stated, in an advisory opinion, that it saw no reason to change the view previously expressed that an act forbidding the use of trading stamps was void because in conflict with the state and federal constitutions. (*In re Opinion of the Justices*, 115 N. E. 978.) The court further said, however, that it could not in that proceeding undertake to change the rule it had established, which was based upon a judgment in a contested case, because under its practice "if such a decision is to be overruled, it can be only after argument in another cause between party and party, where the rights of all can be fully guarded." (p. 979.) The supreme court of Michigan, in a case decided on September 27, 1917, held a statute much like our own to be void, distinguishing it from those upheld by the federal supreme court. The decision, however, seems to have been based in part, at least, upon the fact that the title of the act did not disclose the nature and object of certain exceptions to its operation. (*People v. Sperry & Hutchinson Co.*, 164 N. W. 503.)

The provisions of our own constitution which are violated by the act in question, if the suppression of trading stamps is beyond the police power of the state, are the declarations of the first two sections of our bill of rights, that "all men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness," and that "all free governments  .  .  .  are instituted" for the "equal

protection and benefit" of the people. (Gen. Stat. 1915, §§ 105, 106.) These are given much the same effect as the clauses of the fourteenth amendment relating to due process of law and equal protection. (*Winters v. Myers*, 92 Kan. 414, 140 Pac. 1033.) If the anti-trading-stamp statute is an unwarranted interference with the right of contract or freedom of action guaranteed by the sections of the bill of rights referred to, it must also offend against the provision of the fourteenth amendment forbidding a state to deprive any person of life, liberty or property without due process of law, for the guaranties of that instrument are at least equally broad.

"The liberty mentioned in that amendment means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper, necessary and essential to his carrying out to a successful conclusion the purposes above mentioned." (*Allgeyer v. Louisiana*, 165 U. S. 578, 589.)

If the legislation under consideration is a proper exercise of the police power it violates neither the state nor the federal constitutions. If it is not, it violates both. Therefore, although this court has the power to hold it invalid because in conflict with the fundamental law of this state, it can do so only by rejecting the reasoning upon which the decision of the supreme court of the United States is based, and taking a narrower view of the police power of the state than that adopted by the federal court. If, however, any distinction is to be made between the scope of the mandate which forbids a state to deprive an individual of his liberty without due process of law, and that which declares liberty to be a natural right, the latter should doubtless be confined to a narrower field, since the privileges which it protects are described as inalienable, and must therefore be not only fundamental, but such as could not be abrogated by the people themselves in framing a government.

The question for our determination is not whether in our judgment the objections urged against the trading-stamp device, on which the statute is based, are sound, but whether they are so plainly unsound that they may confidently be characterized as unreasonable and capricious.

The State v. Wilson.

"If it has been enacted upon a belief of evils that is not arbitrary we can not measure their extent against the estimate of the legislature." (*Tanner v. Little,* supra, p. 385.)

The fact that in a majority of the states of the Union some form of repressive legislation against trading stamps has been undertaken, and that the parliament of Canada has prohibited their use, is evidence of a widespread belief in their pernicious influence.

A forcible argument is made in support of the view that the use of trading stamps is an ordinary commercial transaction, fair and open in its character, not subject to be classed with businesses which are dangerous, injurious, or offensive to the public. The basis of the reasoning to the contrary is indicated in these excerpts from the opinions already referred to:

"Having disposed of the other contentions of complainants, we are brought to a consideration of the question whether the statute of Florida offends the due process clause of the 14th amendment of the constitution, In other words, does the statute interfere with the business liberty of complainants? Is it an illegal meddling with a lawful calling and a deprivation of freedom of contract? This is the contention, and it is attempted to be supported by the assertion that the schemes detailed in the bill are but a method of advertising, and, as such, mere allurements to customers, not detrimental in any way to the public health and morals, nor obstructive of the public welfare; but are a means of enterprise, mere incidents of the businesses of complainants, and as beneficial to their customers as to them. And besides that they are but a method of giving discount, practically in some instances a rebate upon the price, and in others an equivalent gift of some article that may attract the choice of the purchaser, the choice being free and the article of definite utility and value.

"These contentions have the support of a number of cases. They are opposed by others, not nearly so numerous as the supporting cases, but marking a change of opinion. Both sets of cases indicate by the statutes passed upon a persistent legislative effort against the schemes under review or some form of them, beginning in 1880 and repeated from time to time until the statute in controversy was passed in 1913. In such differences between judicial and legislative opinion where should the choice be? That necessarily depends upon what reasoning judicial opinion was based. We appreciate the seriousness of the situation. Regarding the number of the cases only, they constitute a body of authority from which there might well be hesitation to dissent except upon clear compulsion.

"The foundation of all of them is that the schemes detailed are based on an inviolable right, that they are but the exercise of a personal liberty secured by the constitution of the United States, and distinguished from other lawful exercise of business contracts and activity by a method of advertising and lawful inducements to an increased custom, and that in

them there is no element of chance or anything detrimental to the public welfare.

. . . . . . . . . . . . . . .

"But no refinement of reason is necessary to demonstrate the broad power of the legislature over the transactions of men. There are many lawful restrictions upon liberty of contract and business. It would be an endless task to cite cases in demonstration, and that the supplementing of the sale of one article by a token given and to be redeemed in some other article has accompaniments and effects beyond mere advertising the allegations of the bill and the argument of counsel establish. Advertising is merely identification and description, apprising of quality and place. It has no other object than to draw attention to the article to be sold, and the acquisition of the article to be sold constitutes the only inducement to its purchase. The matter is simple, single in purpose and motive; its consequences are well defined, there being nothing ulterior; it is the practice of old and familiar transactions and has sufficed for their success.

"The schemes of complainants have no such directness and effect. They rely upon something else than the article sold. They tempt by a promise of a value greater than that article and apparently not represented in its price, and it hence may be thought that thus by an appeal to cupidity lure to improvidence. This may not be called in an exact sense a 'lottery,' may not be called 'gaming'; it may, however, be considered as having the seduction and evil of such, and whether it has may be a matter of inquiry, a matter of inquiry and of judgment that it is finally within the power of the legislature to make." (*Rast v. Van Deman & Lewis*, 240 U. S. 342, 363, 365.)

"The 'premium system' is not one of advertising merely. It has other, and, it may be, deleterious, consequences. It does not terminate with the bringing together of seller and buyer, the profit of one and the desire of the other satisfied, the article bought and its price being equivalents. It is not so limited in purpose or effect. It has ulterior purpose, and how it has developed complainants vividly represent by their averments. It appears that 'companies are formed, called trading-stamp companies, which extend and facilitate the schemes, making a seller of merchandise their agent for the distribution of stamps to be redeemed by them or other merchants, the profit of all being secured through the retail purchaser who has been brought under the attraction of the system. There must, therefore, be something more in it than the giving of discounts, something more than the mere laudation of wares. If companies— evolved from the system, as counsel say in justification of them—are able to reap a profit from it, it may well be thought there is something in it which is masked from the common eye, and that the purchaser at retail is made to believe that he can get more out of the fund than he has put into it, something of value which is not offset in the prices or quality of the articles which he buys. It is certain that the prices he pays make the efficiency of the system and the fund, if we may individualize it, out of which the cost of the instruments and agents of the system must be

The State v. Wilson.

defrayed and the profit to all concerned paid. The system, therefore, has features different from the ordinary transactions of trade which have their impulse, as we have said, in immediate and definite desires having definite and measureable results. There may be in them at times reckless buying, but it is not provoked or systematized by the seller.

.     .     .     .     .     .     .     .     .     .     .     .     .     .     .     .

It is unimportant what the incidents may be called, whether a method of advertising, discount giving, or profit sharing. Their significance is not in their designations, but in their influence upon the public welfare. And of this the judgment of the legislature must prevail, though it be controverted and opposed by arguments of strength." (*Tanner v. Little*, 240 U. S. 369, 384, 385.)

To reach a correct solution of the problem it is necessary to separate, so far as this is humanly possible, the judicial question of the power of the legislature to prohibit the use of trading stamps, from the legislative question of the wisdom and justice of doing so. The test as to whether an act is within the police power is, Has it a real relation to the public good? Does it tend to remove or diminish a practice that is injurious, obnoxious or inconvenient to the public? If the use of trading stamps tends to induce persons to make purchases beyond the limit which they would otherwise observe, and beyond their reasonable needs, it may be regarded as to that extent inimical to the interest of the public. For the state to attempt to protect the individuals constituting the general public from the consequences to themselves of their own improvidence may be highly paternalistic, but that does not prevent its being a legitimate exercise of the police power.

The trading stamp device offers an inducement to make purchases from the merchant using them, which is not connected with the merits of his goods, or with his customers' need of them. It lends itself readily to fostering a belief on the part of the buyer that the stamps cost him nothing—that they are given as lagniappe. And this may be true, in the sense that by their use the merchant saves enough in advertising so that he can and does make a less price to his customers. But that in a broad sense the buyer pays for all that he gets will hardly be disputed. There seems to be a widespread belief that there is an element of possible deception in this aspect of the scheme. Whether the plan may reasonably be expected to cause improvident purchases; whether in practice it does so; and whether it tends to mislead the buyer; are

questions for the final determination of the legislature if there is any reasonable ground whatever for a difference of opinion on the subject. And if it be assumed that there is nothing of immorality or intentional deception in the plan itself, if by reason of the readiness of buyers to form a misconception concerning its operation—to overestimate its benefit to themselves—it works an injury to the public, the sacrifice of those who are compelled for the common good to forego the advantage of its use is only one of a number of instances in which a member, of organized society is required to yield his own interests to those of his fellows—to abstain from conduct which is innocent and harmless in itself, because of the effect which circumstances cause it to have upon others. We acquiesce in the view of the federal supreme court that there is sufficient room for a reasonable difference of opinion as to whether the "premium system" is attended with evil consequences to the public, to place the affirmative decision of that question by the legislature beyond the reach of the courts, and, therefore, that a statute which places a special burden upon a business employing that device does not thereby so far infringe upon individual freedom of action and contract as to transcend the powers of government.

5. A special feature of the general question involved is presented by the contention of the appellant that the statute makes an unwarrantable and unconstitutional discrimination in exempting from its operation the use of stamps which are redeemable from the general stock of the merchant to whose customers they are given, at the regular retail price of the goods. It may reasonably be believed that some of the evils attributed to the use of trading stamps will be obviated or lessened if they are made redeemable only in that manner. It may not unreasonably be thought that the intervention between a merchant and his customers of a separate concern, making a business of exchanging a special line of goods for the stamps, tends to increase their seductive effect. In one of the foregoing quotations the existence of companies engaged in that business is referred to as an argument that there is something more in the device than the giving of discounts or the lauding of wares.

The law-making body "may make discriminations, if founded on distinctions that we can not pronounce unreasonable and

purely arbitrary." (*Quong Wing v. Kirkendall*, 223 U. S. 59, 62.) The legislature has undertaken to repress a particular method of doing business. That it has not seen fit to restrict another somewhat similar method, which may in fact be equally detrimental to the public interest, does not affect the validity of the enactment. (6 R. C. L. 431, 432.)

"Classification must have relation to the purpose of the legislature. But logical appropriateness of the inclusion or exclusion of objects or persons is not required. A classification may not be merely arbitrary, but necessarily there must be great freedom of discretion, even though it result in ill-advised, unequal and oppressive legislation. . . .

"Legislation which regulates business may well make distinctions depend upon the degrees of evil without being arbitrary or unreasonable." (*Heath & Milligan Co. v. Worst*, 207 U. S. 338, 354, 355.)

"If the legislature shares the now prevailing belief as to what is public policy and finds that a particular instrument of trade war is being used against that policy in certain cases, it may direct its law against what it deems the evil as it actually exists without covering the whole field of possible abuses, and it may do so none the less that the forbidden act does not differ in kind from those that are allowed. . . .

If a class is deemed to present a conspicuous example of what the legislature seeks to prevent, the fourteenth amendment allows it to be dealt with although otherwise and merely logically not distinguishable from others not embraced in the law." (*Central Lumber Co. v. South Dakota*, 226 U. S. 157, 160.)

It is true that in a number of jurisdictions where the courts have held statutes to be void which forbid the use of trading stamps, no matter by whom they are to be redeemed, they have also held that the objection was not met by confining the prohibition to the use of stamps redeemable by some one other than the merchant using them. And in some of these cases it has been said that there is no just ground of distinction to be made on that basis. But we think these expressions, save in the Michigan case already referred to, were made by courts holding the general trading-stamp device to be fair and innocent, and beyond the reach of prohibitive legislation. The argument is that a statute forbidding the use of trading stamps altogether is void as an unwarranted interference with personal liberty, and that an exception in favor of stamps redeemed by the dealer using them does not make such a change in the plan as to remove the objection.

51—101 Kan.

When it has been decided that the harmlessness of the general trading-stamp device is so far open to reasonable doubt that a legislative determination that it is injurious to the public is not open to judicial review, it seems to follow that a like immunity should attach to the conclusion of the law-making body that where the stamps are redeemed otherwise than from the general stock of the merchant using them the evil is so far increased as to justify repressing that special feature of the business, while leaving it otherwise unrestricted. A plan by which the holder of a certain number of stamps should receive some article to be determined by chance would of course be objectionable. If the article were to be designated by some one other than the customer the ground of objection would not be wholly removed. If the customer were given a choice between two articles to be selected by a third person, the essential character of the scheme would not be greatly changed. And where he is offered a considerable latitude of choice, but is required to make it from a collection of articles made by a third person for the express purpose of serving as "premiums," the scheme may reasonably be regarded as more nearly related to the original gift enterprise—as less of the nature of a mere rebate in the price—than if the stamps were redeemable from an ordinary stock of merchandise.

But a difference of kind as well as of degree is to be noted. The use of trading stamps redeemable only by a concern engaged in that sole business is open to especial objection, not merely on the ground that it may increase whatever injurious effect is inherent in the general plan, but for the further reason that it has harmful qualities peculiar to itself.

"It is established that a distinction in legislation is not arbitrary, if any state of facts reasonably can be conceived that would sustain it, and the existence of that state of facts at the time the law was enacted must be assumed. It makes no difference that the facts may be disputed or their effect opposed by argument and opinion of serious strength. It is not within the competency of the courts to arbitrate in such contrariety." (Rast v. Van Deman & Lewis, 240 U. S. 342, 357.)

It is readily conceivable that a company making a business of furnishing and redeeming trading stamps may have refused to deal with more than one merchant (or one merchant handling a particular line of goods) in each community, thereby establishing a monopoly in the marketing of its wares, and

The State v. Wilson.

effecting an alliance analogous to an ordinary combination in restraint of trade, to which all with whom it deals are parties, and from which they derive an undue preferential advantage over their competitors. It is not necessary to the validity of the statute that it should be shown that this condition actually existed, it is enough that such may have been the case, and that the business forbidden or repressed is adapted to bringing about that result. To justify the legislation on this theory it is not necessary that the business sought to be restrained should have amounted to such a monopoly or combination in restraint of trade as to have been unlawful in the absence of a statute. It is competent for the legislature to extend the scope of common-law principles, and make them applicable to new situations. The trading-stamp device, where redemption is made otherwise than through the dealer using them, necessarily introduces a middleman into the transaction between the dealer and his customer—a third party who makes a profit out of their bargaining. Such a middleman—a company engaged solely in the business of issuing and redeeming stamps—is in a position to exert an unfavorable influence upon local conditions. It may by the method suggested create a monopoly—a combination in restraint of trade; it may by playing one concern against another force its system upon a community.

In the opinion of the state court in a case, the affirmance of which by the federal court gave rise to one of the decisions already referred to, it was said:

"If a state of facts could exist which would justify the legislature in forbidding the use of trading stamps, it must be presumed to have actually existed. What state of facts might reasonably have prompted the legislature to forbid the use of trading stamps in connection with the sale of merchandise? It might reasonably be supposed or presumed that the legislature believed that the use of these stamps would encourage indiscriminate and unnecessary purchasing by people ill able to indulge in any extravagance. Or suppose that the legislature believed that the use of these stamps was practically forced upon certain merchants without any practical benefit resulting therefrom, and thus they were compelled to pay three and a half per cent upon their gross sales for the use of the stamps. The legislature might reasonably have believed that the stamp companies, in order to cause the stamps to be used in a certain city, would contract with one merchant for their use, agreeing to pay him a percentage of the sums collected by them from other merchants, and then use the first contract so secured to force other merchants into using the stamps or suffer

loss of trade by failure so to do. In other words, that legitimate business was virtually coerced into paying tribute to the stamp company, a non-producer of wealth or value." (*State v. Pitney*, 79 Wash. 608, 613.)

A part of the objections peculiar to this form of the trading-stamp business were thus stated in an early case:

"The Washington Trading Stamp Company and its agents are not merchants engaged in business as that term is commonly understood. They are not dealers in ordinary merchandise, engaged in a legitimate attempt to obtain purchasers for their goods by offering fair and lawful inducements to trade. Their business is the exploitation of nothing more or less than a cunning device.

"With no stock in trade but that device and the necessary books and stamps and so-called premiums with which to operate it successfully, they have intervened in the legitimate business carried on in the District of Columbia between seller and buyer, not for the advantage of either, but to prey upon both. They sell nothing to the person to whom they furnish the premiums. They pretend simply to act for his benefit and advantage by forcing their stamps upon a perhaps unwilling merchant who pays them in cash at the rate of $5 per thousand. The merchant who yields to their persuasion does so partly in the hope of obtaining the customers of another, and partly through fear of losing his own if he declines. Again, a limited number only (an apparently necessary feature of the scheme) are included in the list for the distribution of the stamps, and other merchants and dealers who can not enter must run the risk of losing their trade or else devise some other scheme to counteract the adverse agency." (*Lansburgh v. Dist. of Columbia*, 11 App. D. C. 512, 531.)

In *District of Columbia v. Kraft*, 35 App. D. C. 253, after an elaborate review of the authorities, the court said:

"The whole country is now agitated by the increased cost of living that has grown to alarming proportions, and legislative bodies are inquiring into its causes with a view, if possible, of providing remedies for the mischief. While there is difference of opinion as regards the chief source, all concur in the opinion that every introduction of superfluous middlemen, and consequent unnecessary charges between producer and consumer, undoubtedly contribute to swell the stream to overflowing.

Now what are the conditions presented by the facts in this case? An entirely unnecessary middleman, for his own profit solely, has injected himself between the regular merchant on the one hand and his customers on the other. He receives $3.50 for every thousand stamps issued to the customers, and redeems such as may be presented in goods or in cash at $2 per thousand. By this means the corporation represented by the defendant in error has in the first year of its intervention received about $12,000, which should have either been retained by the merchant or received by his customers.

Several other concerns being engaged in the same business, their profits are probably as great, if not greater. We have then this large sum of

The State v. Wilson.

money annually. taken from the merchant and his customers, and added to the gross cost of living of all of the people of the District, without return. Is it not for the public welfare, in the juridical sense of the term, to prohibit such an undertaking? We think that it is. Must this public welfare be sacrificed to the unlimited freedom of contract invoked in this case, to protect the right to prey upon local commerce? We think not." (pp. 268, 269.)

One may regard these arguments by which the objectionable character of the trading-stamp business is sought to be established as unsound, and still hesitate to say with confidence that they are not fairly debatable—that their acceptance is inconsistent with a fair consideration of the subject by a reasonable mind. One may be persuaded that the burden placed on the freedom of 'contract is out of proportion to the possible good to be accomplished, without being convinced that there is no relation between the end sought and the means adopted.

"While the courts must exercise a judgment of their own, it by no means is true that every law is void which may seem to the judges who pass upon it excessive, unsuited to its ostensible end, or based upon conceptions of morality with which they disagree." (*Otis & Gassman v. Parker*, 187 U. S. 606, 608.)

We think the full power of the legislature to control the use of trading stamps enables it to restrain their employment where they are redeemable from a special stock selected for the purpose, while permitting it where they serve as credits against the general stock of the merchant using them.

6. The appellant contends that the fact that stamps are given only to cash purchasers (or purchasers making payment within a specified time), relieves the plan in use by his company from the objections which form the foundation for those decisions. This question is quite analogous to that already considered, as to whether the agreed facts bring the case within the statute. We think that if there is enough ground for reasonable fear of public injury to warrant legislative repression of the employment of trading stamps at all, the confining of their use to cash customers would not so far change the general character of the device as to remove it from the control of the legislature.. In the second of the series of decisions of the federal supreme court referred to, the statement of facts shows that the giving of stamps was confined to cash customers. (*Tanner v. Little*, 240 U. S. 369, 370.)

7. A question is raised as to the validity of section 3 of the act, which forbids trading stamps to be sold for use in any county other than that of their sale. It does not appear, however, that the appellant was prejudiced by this provision. Moreover, section 4 declares that if any section of the act is held unconstitutional this shall not affect the validity of any other part, thereby excluding any presumption that the adoption of the remainder of the act was induced by the presence of section 3. The validity of that section, therefore, need not be determined.

8. The tax being imposed upon a method of doing business, and not upon property, the provisions of the state constitution with regard to uniformity of assessment, and the statutory statement of the object, do not apply. (*The State, ex rel.*, v. *Ross,* 101 Kan. 377; 166 Pac. 505; 37 Cyc. 729, 732.)

The judgment is affirmed.

BURCH, J., not sitting.