No. 33,592

R. H. LIMPP, doing business as the LIBERTY CREAM STATION, *Appellant*, v. H. E. DODGE, State Dairy Commissioner, *Appellee.*

(73 P. 2d 1001)

Opinion filed December 11, 1937.

*Tinkham Veale,* of Topeka, for the appellant.

*Clarence V. Beck,* attorney general, and *Marvin O. Brummett,* special assistant attorney general, for the appellee.

The opinion of the court was delivered by

THIELE, J.: This was an action for an injunction to prevent revocation of certain licenses hereafter mentioned.

Plaintiff's petition alleged he was operating a cream station in Topeka, and, through agents and employees, purchased cream from producers; that he had been engaged in such business for some months at a profit to himself; that the defendant was the state dairy commissioner; that plaintiff had in his employment as manager or operator of his cream station and as field superintendent

one W. E. Bacon, who had a superintendent's license under G. S. 1935, 65-708; that about April 1, 1936, plaintiff was duly issued a license authorizing him to operate his cream-buying station and that he had been so operating it, and that Bacon was manager, operator and field superintendent for the same; that without lawful reason or justification defendant Dodge, as state dairy commissioner, on May 21, 1936, arbitrarily directed an order to Bacon advising him his field superintendent's license was revoked for thirty days, and that the cream-station license was revoked, and to receive no more cream at the station. Plaintiff alleged the order was without authority of law, was unreasonable, arbitrary and confiscatory, and if enforcement was not enjoined his business would be ruined, to his irreparable damage, and that he had no adequate remedy at law. The prayer was for temporary and for permanent injunction.

The answer of defendant was a denial of all matters not admitted. The admissions include the place of business, method, ownership and operation of plaintiff's business, defendant's official capacity, Bacon's qualifications, certain statutes, regulations set out in the petition, and that plaintiff had a license to operate a cream station. The answer alleged that G. S. 1935, 65-715, provides that any person who violates any provision of the act (with reference to milk, cream and dairy products) or any of the rules and regulations based thereon shall be guilty of a misdemeanor and his permit or license subject to suspension or cancellation by the state dairy commissioner; that rule 24, issued pursuant to G. S. 1935, 65-702, orders every person engaged in the purchase of cream from producers to post in a conspicuous outside place at each place where cream is purchased, in letters and figures not less than two inches high, the price in cents per pound of butterfat content paid for cream purchased, and in a later paragraph that—

"No additional figures, or amounts, or provisions for dividends or deferred payments, shall be used or appear with or in connection with the price posting; and it shall be unlawful to pay other than the posted price, or to pay any amount in addition to such posted price."

It was also alleged that rule 2 provides that on apparent violation, a field superintendent may be required to appear at a hearing before the dairy commissioner to show why action should not be taken against him, and if it be found he violated the law, to suspend his license for thirty days, and on a second finding of violation to revoke his license.

It was further alleged that the plaintiff, in conjunction with and in close proximity to his cream station, maintained and operated a gasoline filling station; that plaintiff, in violation of rule 24, advised producers of cream, selling their product to him, that they were privileged to and could buy gasoline at plaintiff's station at two cents per gallon cheaper than the public could buy gasoline at the same place, and that on dates mentioned plaintiff, in violation of the rule, sold gasoline to his cream patrons at two cents a gallon less than the public paid at the same time and place, and that, as aforesaid, plaintiff paid other than the posted price for cream and thereby paid an amount in addition to such posted price; that all persons, other than cream producers selling to plaintiff, who purchased gas from plaintiff were not allowed the two cents per gallon reduction. It was further alleged that due hearing was given plaintiff and Bacon upon complaint made, and by reason as aforesaid defendant advised plaintiff he was suspending the field superintendent's license for thirty days and was revoking the cream-station license, and that plaintiff and Bacon should receive no more cream at the station. The prayer was that the temporary injunction be dissolved and that plaintiff's action be dismissed, etc.

Plaintiff demurred to the answer, and from an adverse ruling he appeals to this court.

Before discussing appellant's contentions, we may notice that the growing importance of the dairy industry in this state led to the enactment of chapter 404, Laws 1907, creating the office of state dairy commissioner, defining his duties, and making broad provisions for the advancement, improvement and regulation of the dairy industry. The act has been amended from time to time and in 1927 was entirely revised by chapter 242, Laws of 1927, which now appears as G. S. 1935, 65-701 to 65-718, inclusive. The present controversy arises under G. S. 1935, 65-702, which reads:

"The state dairy commissioner and his deputies are hereby authorized and empowered: . . . (3) To require the posting in a conspicuous outside place at their places of business, in letters and figures that are approved by the state dairy commissioner, the local price paid for butterfat by cream buyers; *and that it shall be unlawful to pay other than the posted price."* (Italics ours.)

Attention is also directed to G. S. 1935, 65-708, which makes it unlawful to establish a cream-buying station and under (B) (1) to install any person as station operator without having first obtained a field superintendent's license and under (D) without having first obtained a station license. Under G. S. 1935, 65-715, if any per-

son violate any provision of the act, or rule or regulation based thereon, his permit or license shall be subject to suspension or cancellation by the state dairy commissioner. It is not necessary that we detail the rules and regulations promulgated by the state dairy commissioner. The only one with which we are concerned pertains to posting of the price to be paid for cream, and that it shall be unlawful to pay other than the posted price or to pay any amount in addition to such posted price.

Appellant's contention is based on the claim the dairy commissioner's answer does not charge that he did not pay the posted price for cream, but, rather, that in addition to paying the posted price he offered to those producers selling to him the right to purchase gasoline at two cents per gallon less than the price paid by others. The further statement in his brief is:

"It is the contention of the appellant that when a producer of cream sold his cream to the appellant, and the appellant paid him the posted price therefor, that that transaction was closed, and that if the producer thereafter desired to take some of the money which had been paid by the appellant for his cream and purchase gasoline at the filling station also owned by the appellant, that it was not in violation of section 65-702 of the 1933 Supplement, or rule 24 promulgated by the dairy commissioner by authority of the statute, and in the event it was claimed that it was a violation of the statute and rule 24, that the same would be a violation of section 1 of the bill of rights of the state of Kansas and the fifth and fourteenth amendments to the constitution of the United States."

In support of his contention, he directs our attention to section 1 of the bill of rights of our state constitution, the fifth amendment of the United States constitution and to the decision in *Allgeyer v. Louisiana,* 165 U. S. 578, 17 S. C. R. 427, 41 L. Ed. 832, and argues therefrom that having paid the posted price for cream, he is at liberty to sell his gasoline to any person at whatever price he may see fit. In this connection, he cites *State v. Wilson,* 101 Kan. 789, 168 Pac. 679, in which the validity of the trading-stamp act was under consideration, and in which the extent and exercise of the police power was discussed, and calls our particular attention to the quotation from *State v. Dalton,* 22 R. I. 77, 82, to the effect that legislation of this type must have some relation to the public health, safety or morals, and he argues therefrom that the sale of gasoline, under the circumstances here, has no such relation. But this court, in commenting on the quotation, says:

"The assumption that the police power extends only to the protection of the health, safety and morals of the public, which was at one time quite

general, is now out of date. The modern view is that the state may control the conduct of individuals by any regulation which upon reasonable grounds can be regarded as adapted to promoting the common welfare, convenience, or prosperity. (6 R. C. L. 203, 204.)" (p. 794.)

We do not think it necessary, however, to discuss the question of extent of the police power (for such a discussion, see *Schaake v. Dolley*, 85 Kan. 598, 118 Pac. 80), for the reason that appellant concedes that the legislature has power to pass laws affecting the health, morals, safety and general welfare of the people. Appellant does not contend that the act with respect to regulating the production and sale of dairy products is open to attack. Essentially, his argument is that the sale of gasoline, as charged in the answer, has no relation to or connection with his purchase of cream from producers. Neither can there be any argument there is an attempt to fix the price either of cream or of gasoline. The statutes above mentioned give the state dairy commissioner no power to fix the price of cream, let alone the price of gasoline or any other article. The full extent of the statute, and of the rules promulgated under it, is to require the operator of the cream-buying station to post the price he will pay, and to make it unlawful to pay other than the posted price, or any amount in addition thereto. While conceding the act is a valid exercise of the police power, appellant contends further that the sale of gasoline has no connection with or relation to the producer's ability or willingness to produce clean and wholesome cream, and that if the sale to him of gasoline at a reduced price has any effect, it is only to provide him with more funds for the purposes of his business. The appellee contends that the sale of gasoline cannot be considered apart from the purchase of cream, and that appellant's method of doing business must be considered as a whole, and that the effect is to permit a rebate or something equivalent thereto, with the result that the seller of cream who purchased gasoline at the reduced price, in effect receives more than the posted price for cream, and thus by subterfuge the statute is violated.

It must be assumed that in passing the above-mentioned statute the legislature believed there was an evil to be corrected and a useful purpose to be served. We may not inquire whether the method it devised was the best, or better than some other. It was within its power to make the requirements of the statute effective by providing that if a field superintendent or cream-station operator did not obey, he might have his license suspended or revoked upon proper

notice and hearing. The appellant does not contend that the suspension and revocation of the licenses were not after due notice and hearing.

The principal question presented is whether the purchase of cream at the posted price with the right extended to the seller to purchase gasoline at a discount not available to others, with subsequent purchase of gasoline by the cream seller, constitutes one transaction, or whether the purchase of cream at the posted price is a completed transaction having no relation to the sale of gasoline, which is in and of itself a separate transaction. Under the first view, we may inquire whether the method of operation is not a scheme or subterfuge to avoid compliance with the statute. If we accept that view, then the state dairy commissioner was acting in accordance with his statutory duty and authority in suspending and revoking the licenses.

In *State, ex rel., v. Goldman Jewelry Co.*, 142 Kan. 881, 51 P. 2d 995, an original proceeding in quo warranto, the state sought to oust the defendant corporation from practicing optometry, which defended on the ground that it leased space to a licensed optometrist and contracted with him to practice his profession in the rented space. This court considered that defense and said:

"Stronger language might be used to characterize them, but as we view them the contract of employment and the lease in connection with it are devices to avoid the provisions of our statutes with reference to practicing optometry, and cannot avail the defendant." (p. 891.)

Another original proceeding in quo warranto was *State, ex rel., v. Fox Kansas Theatre Co.*, 144 Kan. 687, 62 P. 2d 929, where the state sought to oust the defendant because of its violation of the lottery laws by conducting what was known as "bank night."

After an examination of the plan, this court said:

"Besides, we cannot escape the impression from the intricate and complicated outline of the 'bank night' plan, as set out in the answer, and said to have been recognized by the government of the United States as deserving of a copyright and trade-mark, that it is in effect a plan to evade the constitutional and statutory provisions of this state as to lotteries." (p. 700.)

In *State v. Fremont Coöperative Burial Ass'n*, (Ia.) 270 N. W. 320, the question was whether the defendant was engaged in the practice of embalming without having a license so to do. We need not detail the facts which showed the association, which was incorporated to furnish its members with burial services, purchased all supplies and paid a licensed mortician a salary to perform certain

duties. After holding the association's method substantially permitted burial services to be rendered to the public generally, the court stated:

"To allow the business of the appellant association to be thus conducted, and the benefits of membership in the association to be thus extended to the public generally, regardless of membership in the association at the time the death occurred, would be to approve of a scheme and a subterfuge which would permit the association to evade the purpose and provisions of the law." (p. 322.)

To recapitulate, it is evident the legislature, when it passed the act creating the office of state dairy commissioner, providing means and methods to insure production and sale of clean and wholesome dairy products, did so because it was convinced that regulation was not only desirable but necessary, and it must be assumed that the amended and revised act of 1927, requiring the posting of price to be paid and the payment of such posted price, was in order to make the regulation more effective and desirable. Had all cream buyers always maintained high standards of cleanliness in the maintenance of their places of business and of thoroughly ethical methods of doing business there would have been no need of any part of the act. That they did not do so is evident from the course of the legislation. Nor is it particularly unusual that after the original act was passed, or that after it was amended as it now is, that some cream-station operators sought to circumvent the requirements of the statute. As was said in *Equitable Loan Co. v. Waring,* 117 Ga. 599, 44 S. W. 320, 62 L. R. A. 93, 97 Am. St. Rep. 177, a case involving operations of an investment company and the appointment of a receiver to conduct its affairs, because of irregularities:

"The ingenuity with which schemes of chance are varied to avoid the statutes or add new and alluring features is little short of wonderful. As fast as statutes are passed, or decisions made, some skillful change is devised in the plan of operations, in the hope of getting just beyond the statutory prohibition; but so long as the inherent evil remains, it matters not how the special facts may be shifted, the scheme is still unlawful." (p. 615.)

And in the very recent case of *Newman v. Dore,* 275 N. Y. 371, 9 N. E. 2d 966, the court had for consideration whether a certain trust agreement was made for the purpose of depriving a widow of her rights under the decedent estate law, and said:

"Though a person may use means lawfully available to him to keep outside of the scope of a statute, a false appearance of legality, however attained, will not avail him. Reality, not appearance, should determine legal rights. (Cf. *Jenkins v. Moyse,* 254 N. Y. 319, 172 N. E. 521, 74 A. L. R. 205.)" (p. 380.)

No reiteration on our part can add to or detract from the scheme of business followed by the plaintiff. If there could be doubt about the purpose to be accomplished by plaintiff's method of business, bearing in mind the statutes and the mischief sought to be remedied, we should, in the language used in *Magdalen College Case,* 11 Coke 66, 71 (77 Eng. Reports, pp. 1235, 1242), though there used with reference to statutes, "make such construction as will suppress the mischief, and advance the remedy." To paraphrase the language used in *State v. Mercantile Co.,* 103 Kan. 733, 739, 176 Pac. 321: The plaintiff's *modus operandi,* as set forth in the answer and conceded for the purposes of the demurrer, is a plain, palpable and futile attempt to do by indirection what the statute plainly forbids.

The judgment of the trial court overruling plaintiff's demurrer to defendant's answer is affirmed.