No. 104,761

DOWNTOWN BAR AND GRILL, LLC, *Appellee*, v. STATE OF KANSAS, *Appellant*.

(273 P.3d 709)

Opinion filed April 6, 2012.

*Kimberly M.J. Lynch*, assistant attorney general, argued the cause, and *Tim J. Riemann*, assistant attorney general, was on the brief and *Kimberly M.J. Lynch* was on the reply brief for appellant.

*Michael W. Merriam*, of Topeka, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

NUSS, C.J.: The State appeals a trial court's temporary injunction. The injunction prevents the State from enforcing a statute that essentially exempts certain private liquor-serving clubs from a statewide prohibition against indoor smoking. Downtown Bar and Grill, LLC (Downtown Bar) is not one of those exempt clubs and obtained the injunction on equal protection grounds. We transferred the State's appeal from the Court of Appeals under K.S.A. 20-3018(c).

We reverse and remand to the trial court because Downtown Bar is unable to establish an element essential to issuance of a temporary injunction: a substantial likelihood of eventual success on the merits. See *Steffes v. City of Lawrence*, 284 Kan. 380, 394, 160 P.3d 843 (2007).

## FACTS

The material facts are not in dispute. In Kansas any organization serving alcohol by the drink must possess a liquor license. See K.S.A. 41-2601 *et seq.* The organization may be licensed as a drinking establishment, as a Class B club, or as another entity such as a Class A club under K.S.A. 41-2606. A simple drinking establishment is any "premise[] which may be open to the general public, where alcoholic liquor by the individual drink is sold." K.S.A. 2010 Supp. 41-2601(i). But a Class B club is a "premise[] operated for profit by a corporation, partnership or individual, to which members of such club may resort for the consumption of food or alcoholic beverages and for entertainment." K.S.A. 2010 Supp. 41-2601(f).

Downtown Bar is a Class B club in Tonganoxie that acquired its Class B club license on May 4, 2009. Previously it operated as simply a drinking establishment.

Approximately 1 year after Downtown Bar acquired its Class B license, the 2010 legislature enacted House Bill 2221, otherwise known as the Kansas Indoor Clean Air Act, L. 2010, ch. 8, secs. 2-8; K.S.A. 2010 Supp. 21-4009 *et seq.* Effective July 1, 2010, the Act generally prohibits smoking in public places and places of employment. K.S.A. 2010 Supp. 21-4010(a). But the Act exempts Class B clubs as long as the club (1) was so licensed as of January 1, 2009, and (2) notifies the Secretary of the Kansas Department of Health and Environment in writing, not later than 90 days after July 1, 2010, that it wishes to continue to allow smoking on its premises. The Act states in relevant part:

"(d) The provisions of this section shall not apply to:

. . . .

"(8) a class A or class B club defined in K.S.A. 41-2601, and amendments thereto, which (A) held a license pursuant to K.S.A. 41-2606 *et seq.*, and amendments thereto, as of January 1, 2009; and (B) notifies the secretary of health and environment in writing, not later than 90 days after the effective date of this act, that it wishes to continue to allow smoking on its premises." K.S.A. 2010 Supp. 21-4010(d)(8).

Because Downtown Bar was licensed simply as a drinking establishment on January 1, 2009—and not as a Class B club—it is ineligible for a smoking ban exemption under the Act.

The 2010 session was not the legislature's first effort to pass House Bill 2221 for enacting a statewide smoking ban. One year earlier, the 2009 legislature failed to pass this legislation, which included the January 1, 2009, "cut-off" or grandfathering date.

Downtown Bar brought this declaratory judgment action asking the trial court to declare that K.S.A. 2010 Supp. 21-4010(d)(8) and (9) violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and § 1 of the Kansas Constitution Bill of Rights and to accordingly issue temporary and permanent injunctive relief. It argued the statute differentiates—without a "rational basis connected to its legislative purpose"—between Class B clubs organized before January 2, 2009, and Class B clubs like itself that organized after January 1, 2009. The trial court agreed, holding that the cut-off date was arbitrary, which therefore meant it could not be rational. It issued a temporary injunction prohibiting the State's enforcement of the statute. The State appeals.

More facts will be added as necessary to the analysis.

## ANALYSIS

### Standard of review

Downtown Bar correctly acknowledges that we ultimately review the granting or denial of an injunction under an abuse of discretion standard. *Steffes*, 284 Kan. 380, Syl. ¶ 6. And the parties correctly agree that five factors are necessary for issuing a temporary injunction: (1) a substantial likelihood of eventually prevailing on the merits; (2) a reasonable probability of suffering irreparable future injury; (3) the lack of obtaining an adequate remedy at law; (4) the threat of suffering injury outweighs whatever damage the proposed injunction may cause the opposing party; (5) and the impact of issuing the injunction will not be adverse to the public interest. 284 Kan. at 395.

The State argues the trial court erred in finding Downtown Bar had established the first factor: a substantial likelihood that Downtown Bar would eventually prevail on the merits. Reviewing this factor requires us to examine whether the Act may violate Downtown Bar's rights to equal protection under the law. Our review of

this particular question is de novo. See *Steffes*, 284 Kan. at 388-89 (unlimited review of constitutional challenge to law); see also *State v. Gonzalez*, 290 Kan. 747, 755, 234 P.3d 1 (2010) (unlimited review of legal conclusions upon which a district court judge's discretionary decision is based).

We acknowledge that the Fourteenth Amendment to the United States Constitution guarantees equal protection of the laws, and the Kansas Constitution Bill of Rights § 1 provides essentially the same protection. *State v. Limon*, 280 Kan. 275, 283, 122 P.3d 22 (2005). In reviewing whether K.S.A. 2010 Supp. 21-4010(d)(8) may violate Downtown Bar's equal protection rights and therefore be unconstitutional, we also consider that

"under the separation of powers doctrine, this court presumes statutes are constitutional and resolves all doubts in favor of a statute's validity. Courts must interpret a statute in a way that makes it constitutional if there is any reasonable construction that would maintain the legislature's apparent intent." *Brennan v. Kansas Insurance Guaranty Ass'n*, 293 Kan. 446, 450, 264 P.3d 102 (2011) (citing *State v. Laturner*, 289 Kan. 727, 735, 218 P.3d 23 [2009]).

As a result, we have held that the burden on the party claiming unconstitutionality such as Downtown Bar is a "weighty" one. See *Steffes*, 284 Kan. at 388. Our analysis will not address the constitutionality of subsection (d)(9) because Downtown Bar has abandoned that argument in its brief. See *Cooke v. Gillespie*, 285 Kan. 748, 758, 176 P.3d 144 (2008) (A point raised only incidentally in a party's brief but not argued in the brief is deemed abandoned.).

*Discussion*

We recently reiterated our stair-step analysis of an equal protection claim in *Board of Miami County Comm'rs v. Kanza Rail-Trails Conservancy, Inc.*, 292 Kan. 285, 315-16, 255 P.3d 1186 (2011):

"The first step of an equal protection analysis is to determine the nature of the legislative classifications and whether the classifications result in arguably indistinguishable classes of individuals being treated differently. . . .

"After determining the nature of the legislative classifications, a court examines the rights which are affected by the classifications. The nature of the rights dictates the level of scrutiny to be applied. [Citations omitted.] . . .

"The final step of the analysis requires determining whether the relationship between the classifications and the object desired to be obtained withstands the applicable level of scrutiny. [Citation omitted.]"

Each of the three steps will be analyzed in turn.

Issue 1: *Class B clubs formed before January 2, 2009, are similarly situated to Class B clubs formed after January 1, 2009.*

The parties do not dispute, and we agree, that a Class B club formed before January 2, 2009, is similarly situated to a Class B club such as Downtown Bar formed after January 1, 2009. All Class B clubs are subject to the same directives of liquor sale regulation, regardless of their date of formation. See K.S.A. 41-2601 *et seq.* (regulation of liquor sales entities not based on date of formation).

Issue 2: *The Act does not implicate fundamental rights or suspect classes.*

Both federal and Kansas law identify three levels of scrutiny that may be applied in equal protection claims:

"(1) the rational basis standard to determine whether a statutory classification bears some rational relationship to a valid legislative purpose; (2) the heightened or intermediate scrutiny standard to determine whether a statutory classification substantially furthers a legitimate legislative purpose; and (3) the strict scrutiny standard to determine whether a statutory classification is necessary to serve some compelling state interest." *Miami County*, 292 Kan. at 316 (citing *Limon*, 280 Kan. at 283-84).

Which particular level of scrutiny will apply depends upon the nature of the rights involved.

The State contends the trial court was correct to apply the rational basis test. Downtown Bar essentially agrees: its petition exclusively alleged a lack of rational basis. But it asks us to apply the test with a twist. It specifically contends that the "rational basis is appropriate, but that standard is not a bright-line rule. There are nuances in any equal protection analysis, even under rational basis." It proceeds to assert that "rational" means "logical," and not just "any speculative zany idea that the legislature may have had in mind." Downtown Bar further argues that "as demonstrated in [*Farley v.*] *Engelken* [241 Kan. 663, 740 P.2d 1058 (1987)], rational

basis is not a 'toothless remedy.' If it is interpreted to mean just *any* basis at all, it is a meaningless concept." (Emphasis added.)

We agree that the appropriate standard is the rational basis test. Class B clubs are not a suspect class. See, *e.g.*, *Grutter v. Bollinger*, 539 U.S. 306, 326, 123 S. Ct. 2325, 156 L. Ed. 2d 304 (2003) (strict scrutiny test for discrimination by race as suspect class); *United States v. Virginia*, 518 U.S. 515, 532-33, 116 S. Ct. 2264, 135 L. Ed. 2d 735 (1996) (heightened scrutiny test for discrimination by gender as quasi-suspect class). And as the State notes, smoking is not a fundamental right. See *Dunn v. Blumstein*, 405 U.S. 330, 342, 92 S. Ct. 995, 31 L. Ed. 2d 274 (1972) (strict scrutiny test for discrimination involving fundamental rights of voting and interstate travel). As we said in *State v. Stallings*, "if the legislative classification does not target a suspect class or burden a fundamental right, the court applies a rational basis test." 284 Kan. 741, 751, 163 P.3d 1232 (2007) (citing *Limon*, 280 Kan. at 284).

Furthermore, Downtown Bar effectively acknowledges that the ban concerns social legislation when its brief concedes that "health concerns motivated the legislature to adopt the general statewide smoking ban." And we observe that "[t]he rational basis test has traditionally been applied where equal protection challenges have been brought against social . . . legislation." *KPERS v. Reimer & Koger Assocs., Inc.*, 261 Kan. 17, 42, 927 P.2d 466 (1996).

For several reasons, we must also reject Downtown Bar's specific suggestion that we apply a nuanced rational basis test. First, the analysis in *Farley*, 241 Kan. 663, is inapplicable. *Farley* involved the right to a remedy for medical malpractice victims—who the principal opinion held were as politically powerless as the traditional "suspect" and "semi-suspect" classifications, *"e.g.*, minorities, women, illegitimates, and aliens." 241 Kan. at 672. The principal opinion reasoned that because those traditional classifications were entitled to a more rigorous scrutiny than the rational basis test, then the malpractice victims were similarly entitled. But this "heightened scrutiny" standard was adopted only by the two justices in the principal opinion. It was specifically rejected by the two justices in the concurring opinion and by the three remaining justices in the dissent. And second, despite Downtown Bar's con-

cerns, our rational basis calculus discussed below does not approve as constitutional "any speculative zany idea" or "just any basis at all."

Issue 3: *The distinction between Class B clubs formed before January 2, 2009, and those formed after January 1, 2009, has a rational relationship to the statewide smoking ban.*

We have recognized that the rational basis standard is a "very lenient standard." *Peden v. Kansas Dept. of Revenue*, 261 Kan. 239, 258, 930 P.2d 1 (1996), *cert. denied* 520 U.S. 1229 (1997). And we defined the limits of this very lenient standard in *Miami County*, 292 Kan. at 316-17:

"Where, as in this case, a party attacks a statute as facially unconstitutional under the Equal Protection Clause for failing to satisfy the rational basis standard, the party must demonstrate that 'no set of circumstances exist' that survive constitutional muster. *Injured Workers of Kansas [v. Franklin]*, 262 Kan. [840,] 850[, 942 P.2d 591 (1997)]. For this reason, it is not enough to '[s]imply point[ ] out that [a statute] might not be rationally related to the state objectives sought under one set of facts.' *Injured Workers of Kansas*, 262 Kan. at 851. *Instead, a party 'asserting the unconstitutionality of a statute under the rational basis standard "ha[s] the burden 'to negative every conceivable basis which might support [the classification].'" '* [Citations omitted.]" (Emphasis added.)

As the United States Supreme Court has succinctly explained: "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowan v. Maryland*, 366 U.S. 420, 426, 81 S. Ct. 1101, 6 L. Ed. 2d 393 (1961). So "[i]t is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature. [Citation omitted.]" *In re Tax Appeal of Weisgerber*, 285 Kan. 98, 108-09, 169 P.3d 321 (2007).

At oral argument before this court, counsel for Downtown Bar conceded that if we apply a rational basis test without his requested nuances, he cannot meet his burden. In other words, he cannot "negative every conceivable basis which might support the statutory classification" in the smoking ban. See *Miami County*, 292 Kan. at 316. As explained below, we agree.

We continue our analysis by acknowledging that Downtown Bar presents the issue for our resolution as simply whether it was de-

nied equal protection of the law by the Act's cut-off or grandfathering date of January 1, 2009. Downtown Bar does not challenge the objective of the bill, *i.e.*, the State may promote its interest in the health and safety of its citizens by reducing exposure to secondhand smoke. Nor does it challenge the *fact* of grandfathering.

Given this narrowing, the State suggests two conceivable bases support the January 1, 2009, cut-off or grandfathering date. First, it alleges this date is rationally related to the State's legitimate interest in protecting the reliance interest of older clubs, citing *New Orleans v. Dukes*, 427 U.S. 297, 96 S. Ct. 2513, 49 L. Ed. 2d 511 (1976). Second, it contends the date is rationally related to the State's legitimate interest in preventing mere drinking establishments from circumventing the smoking ban. The State alleges that absent this cut-off date, they could circumvent by (1) reorganizing as Class B clubs during the pendency of the legislation, *i.e.*, before the ban took effect on July 1, 2010, and then (2) electing to continue to allow smoking on their premises.

We start with the second conceivable basis alleged by the State. The State points out that the 2009 legislature tried to pass the same legislation—a statewide smoking ban (including drinking establishments) that nevertheless allowed exemptions for Class B clubs in existence before January 1, 2009. The January 1 cut-off therefore could have prevented drinking establishments from circumventing the ban by converting to Class B club status during the pendency of the 2009 legislation. The State reasons that drinking establishments therefore would know that such legislation could be revived during the 2010 legislative session. So the State contends that such drinking establishments, essentially given a reprieve by the legislative failure in 2009, could try to circumvent the anticipated ban by converting to Class B club status before the legislature *did* pass such a law in 2010. According to the State's logic, the 2010 legislature's retention of the January 1, 2009, cut-off continued to prevent that circumvention.

In support of this purported conceivable basis, the State first points out that as of June 23, 2010, Kansas had 1,814 "drinking establishments." And as of 1 week later, all of them would be statutorily required to be smoke-free. The State next points out that

by June 23, 2010, Kansas had 127 Class B clubs, an increase of nearly 30 percent from January 1, 2009. The State concludes that the increase demonstrates its point: The 2010 legislature conceivably could have kept the January 1, 2009, date to prevent those 1,814 drinking establishments from reorganizing as Class B clubs and thus circumventing the smoking ban before it could ever take effect.

In granting Downtown Bar injunctive relief, the trial court first made a ruling consistent with the State's position. It held that the January 1, 2009, date arose during the 2009 legislative session as an attempt to prevent entities like drinking establishments from rushing to seek club status:

"What more likely seems to be the case is that the occurrence arises from a history of the substance of the text for H.B. 2221, which text was inserted in H.B. 2221 by the Senate in 2009 and passed. . . . Thus, in a bill drafted . . . for passage in 2009 to carry a cut-off date for the grandfathering of class A and class B clubs as of the beginning of that year [2009] when the bill was intended to be passed that year *seems rational in assuring or preventing a rush to club status by, for example, 'drinking establishments.'* " (Emphasis added.)

But the court then disagreed with the State's other principal point. It held that because the January 1, 2009, date was simply left over from the failed legislative attempt in 2009, the date was wholly arbitrary and therefore unable to provide a rational basis for the 2010 Act.

"However, as noted, the bill was not passed in 2009, but rather was resurrected and reenrolled on February 26, 2010. Counsel associated with Intervenors indicated it then passed the Kansas House of Representatives on a procedure providing for no amendments. Thus, what had been intended in 2009 and had 'died' and which provided a short window for grandfathering class A and class B club status became one of over one year by the 2010 passage.

"While citizens are deemed to know the law, they are not deemed to know what their legislature is doing. Thus, to consider the basis for the distinction, represented by the exemption date, as justifiable as a more or less 'put on notice' provision is not a fair or rational assumption. *The result is that January 1, 2009, cut off for class A and class B exemption from the state wide smoking ban seems, at best, an unintended consequence, and nevertheless, wholly arbitrary because this particular date, other than by its existence, finds no rational basis for its selection.* Accordingly, until this aspect of the ban is further examined, a temporary

injunction should issue in favor of Plaintiff, Downtown Bar and Grill." (Emphasis added.)

In agreeing with the trial court that the cut-off date was arbitrary and therefore could have no rational basis connected to the smoking ban, Downtown Bar contends the State has produced no evidence that the 2010 legislature actually chose the January 1, 2009, date to prevent drinking establishments from circumventing the ban. But no such evidence is necessary. " '[A] legislative choice is not subject to courtroom factfinding and may be based on *rational speculation* unsupported by evidence or empirical data.' " (Emphasis added.) *Peden*, 261 Kan. at 263 (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315, 113 S. Ct. 2096, 124 L. Ed. 2d 211 (1993). And instead of a State obligation to provide evidence, it was Downtown Bar's obligation to negative every conceivable basis for the cut-off date of January 1, 2009. See *Miami County* 292 Kan. at 316-17.

Turning to the trial court's holding, we start with its conclusion that the January 1, 2009, cut-off date in the 2009 legislation "seems rational in assuring or preventing a rush to club status by, for example, 'drinking establishments' " so they could not seek exemption from the smoking ban during the pendency of the legislation. A cut-off date earlier than the effective date of the 2009 bill becoming law—typically upon its publication in the Kansas Register or on July 1 of the year the bill is passed by the legislature—was apparently acceptable to the trial court. And we agree.

We disagree, however, with the trial court's next conclusion that the January 1, 2009, cut-off date stopped being rational merely because it was not independently—or deliberately—"selected" by the 2010 legislature. If the 2009 legislature conceivably chose the January 1, 2009, date as a cut-off—which would eliminate any incentive to rush to Class B club status during the pendency of the 2009 legislation—then it is exceedingly difficult, if not impossible, to conclude that the 2010 legislature could not conceivably have retained that same cut-off date for the same reason during its own session. See *Peden*, 261 Kan. at 263 (legislative choice may be based on rational speculation). And under these circumstances,

courts certainly do not ask whether they would have chosen that particular date for the 2010 Act. See *Beach Communications, Inc.*, 508 U.S. at 313 ("[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."). As the Supreme Court has stated, such "restraints on judicial review have added force 'where the legislature must necessarily engage in a process of line-drawing.'[Citation omitted.]" 508 U.S. at 315.

Under these circumstances, we must conclude the trial court erred in holding that Downtown Bar established a substantial likelihood that it would eventually succeed on the merits of its equal protection claim. *Miami County*, 292 Kan. at 317 (burden to negative every conceivable basis which might support the classification). Because this element is an essential predicate for a temporary injunction, the trial court erred in its issuance. See *Steffes v. City of Lawrence*, 284 Kan. 380, 394, 160 P.3d 843 (2007). Given this analysis, we need not review any other conceivable bases for the cut-off date, *e.g.*, protecting reliance interests of older clubs.

We therefore reverse and remand to the trial court for proceedings consistent with this opinion. *Cf. Augusta Medical Complex, Inc. v. Blue Cross*, 227 Kan. 469, 473, 608 P.2d 890 (1980) (held an abuse of discretion for trial court to grant temporary injunction requiring appellant to continue to carry out contract terms when under agreed facts, as a matter of law, appellant had right to terminate the contract and did so; reversed and remanded).