Leben, J.:
The 2015 Kansas Legislature passed a bill, signed into law by Governor Sam Brownback, that outlawed the most common method of second-trimester abortions. Before the laws July 1 effective date, a state district court entered a temporary injunction that kept the law from taking effect.
*275 The district court based its order on provisions of the Kansas Constitution Bill of Rights, concluding that they provide the same right to abortion as the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The State has appealed, contending that there is no abortion right under the Kansas Constitution.
But the Kansas Supreme Court has said for nearly a century that sections 1 and 2 of the Kansas Constitution Bill of Rights have “much the same effect” as the Due Process and Equal Protection Clauses of the United States Constitution. State v. Limon, 280 Kan. 275, 283, 122 P.3d 22 (2005); State ex rel. Stephan v. Parrish, 257 Kan. 294, Syl. ¶ 5, 891 P.2d 445 (1995); State ex rel. Tomasic v. Kansas City, Kansas Port Authority, 230 Kan. 404, 426, 636 P.2d 760 (1981); Manzanares v. Bell, 214 Kan. 589, 602, 522 P.2d 1291 (1974); Henry v. Bander, 213 Kan. 751, 752-53, 518 P.2d 362 (1974); Tri-State Hotel Co. v. Londerholm, 195 Kan. 748, Syl. ¶ 1, 408 P.2d 877 (1965); State v. Wilson, 101 Kan. 789, 795-96, 168 Pac. 679 (1917). And a right to abortion has been recognized under the Due Process Clause of the Fourteenth Amendment to the United States Constitution for more than 40 years. Roe v. Wade, 410 U.S. 113, 153, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973). We therefore conclude that sections 1 and 2 of the Kansas Constitution Bill of Rights provide the same protection for abortion rights as the Due Process Clause of the Fourteenth Amendment to the United States Constitution; the district court correctly determined that the Kansas Constitution Bill of Rights provides a right to abortion.
The State also argues that even if Kansas had such a right, the new Kansas statute would not unduly burden women seeking to exercise that right. But the United States Supreme Court held in Stenberg v. Carhart, 530 U.S. 914, 938, 945-46, 120 S. Ct. 2597, 147 L. Ed. 2d 743 (2000), that a Nebraska statute that outlawed both the type of abortion at issue here and another less-common procedure unduly burdened abortion rights and was unconstitutional. Kansas already bans the less-common procedure, so the new law would put Kansas in the same position as Nebraska before its statute was found to be unconstitutional. Based on Stenberg, there is a substantial likelihood that the Kansas statute is unconstitutional, so the district court properly entered a temporary injunction.
*276 Factual and Procedural Background
The legislature called the law at issue here the Kansas Unborn Child Protection from Dismemberment Abortion Act. With limited exceptions, the statute would ban what the medical profession calls a “dilation and evacuation” or “D & E” abortion, the primary method for second-trimester abortions in the United States. K.S.A. 2015 Supp. 65-6741 et seq.-, L. 2015, ch. 22. The plaintiffs, two board-certified obstetrician-gynecologists and their medical practice, seek to continue performing D & E abortions. The plaintiffs perform abortions only up to 21.6 weeks from the womans last menstrual period, which means that the fetus is not yet viable, i.e., able to survive outside the womb. See Alpha Med. Clinic v. Anderson, 280 Kan. 903, Syl. ¶ 4, 128 P.3d 364 (2006).
Because we are reviewing a law that seeks to ban an abortion method and because the State defends that law in part by arguing that alternative methods are available, we must describe and discuss abortion procedures. Faced with the same task, Justice Stephen G. Breyer provided tírese introductory comments, with which we agree:
“Considering the fact that [these] procedures seek to terminate a potential human life, our discussion may seem clinically cold or callous to some, perhaps horrifying to others. There is no alternative way, however, to acquaint die reader with die technical distinctions among different abortion methods and related factual matters, upon which the outcome of this case depends.” Stenberg, 530 U.S. at 923.
We will start by describing two abortion procedures—D & E and a variant called intact D & E, both described in the Supreme Courts Stenberg opinion. D & E is the most common method, used in about 95% of second-trimester abortions (about 10% of all abortions performed in the United States are done in the second trimester). In this procedure, the physician dilates the cervix and uses surgical instruments to remove the fetus by pulling it “through the cervix into the birth canal.” 530 U.S. at 925. Put bluntly, if the fetus is too large to fit through the cervix, friction against the cervix causes the fetus to tear apart. Performing this D & E procedure on a living, though nonviable, fetus (as commonly done) would be banned by the Kansas statute at issue here. K.S.A. 2015 Supp. *277 65-6742(b)(l); K.S.A. 2015 Supp. 65-6743(a); L. 2015, ch. 22, secs. 2-3.
Although D & E is quite safe for tire woman, it does carry some risks, like any medical procedure. For example, as the fetus tears, sharp bone fragments can cause accidental uterine perforations. In addition, tire more times an instrument passes into the uterus, the greater the risk of infections or perforations caused by the instrument. To reduce these risks, some doctors at one time preferred using the intact D & E procedure. In that method, the doctor pulls the fetus through the cervix intact by collapsing tire skull. Kansas has banned the intact D & E abortion procedure (also called a partial-birth abortion) since 1998. See K.S.A. 2014 Supp. 65-6721; L. 1998, ch. 142, sec. 18; L. 2011, ch. 91, sec. 30.
As part of its argument that the new Kansas statute does not violate any abortion right a woman might have, the State contends that the statute does not unduly burden that right—or make it too difficult to exercise—since alternative abortion methods would still be available. More specifically, the State has suggested three alternatives to the standard D & E procedure: labor-induction abortion, inducing fetal demise with digoxin injections, and inducing fetal demise by cutting the umbilical cord (also known as transection). A labor-induction abortion uses a combination of drugs that induce labor and delivery of the nonviable fetus. See Planned Parenthood of Southwest Ohio Region v. DeWine, 696 F.3d 490, 494-95 (6th Cir. 2012). The other options (inducing fetal demise by digoxin or transection) would add additional procedures onto the D & E abortion so that fetal demise occurs before the fetus is removed. If the fetus is no longer alive when the doctor proceeds with the D & E procedure, that would not violate the new Kansas statute, which forbids dismemberment only when it involves “a living unborn child.” K.S.A. 2015 Supp. 65-6742(b)(l); L. 2015, ch. 22, sec. 2.
This case has reached us after the entry of a temporary injunction, which often must be considered in a short time period. That was true here: the statute was signed by the Governor on April 7, 2015; the case was filed on June 1; and the district court had to consider whether to prevent the statute from taking effect on July *278 1. “The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.” University of Texas v. Camenisch, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981); see also Steffes v. City of Lawrence, 284 Kan. 380, 394, 160 P.3d 843 (2007). Accordingly, requests for temporary injunction are often considered based on written testimony submitted by the parties. See K.S.A. 60-902. Here, the plaintiffs submitted written testimony from three physicians: Dr. Traci Lynn Nauser, one of the plaintiffs and a board-certified obstetrician-gynecologist; Dr. Anne Davis, a board-certified obstetrician-gynecologist and an associate professor at the Columbia University Medical Center in New York City; and Dr. David Orentlicher, who has both a medical degree and a law degree and serves as both a professor of law at the Robert H. McKinney School of Law at Indiana University and an adjunct professor of medicine at the Indiana University School of Medicine.
The State did not submit any written testimony to the district court, and it did not seek to present any witnesses at the hearing held by the district court on the plaintiffs’ request for a temporary injunction. Instead, the State cited some articles from medical literature in its brief to the district court; the State cites some of those again on appeal.
It does not appear, however, that the State has properly challenged any of the district courts factual findings in this appeal. The State s appellate brief raises two legal issues but does not claim that the district courts factual findings are unsupported by substantial evidence. Although the States reply brief pur-ports to challenge some of the district courts factual findings (by citing medical literature referenced in its district court brief), new issues cannot be raised in a reply brief. See State v. McCullough, 293 Kan. 970, 984-85, 270 P.3d 1142 (2012).
Even if the State had properly challenged the district courts factual findings in this appeal, we would reject that challenge. “In cases in which a trial courts decision regarding an injunction is based on disputed facts, . . . we . . . look at whether the factual basis for its decision is supported by sufficient evidence.” State Bd. of Nursing v. Ruebke, 259 Kan. 599, 611, 913 P.2d 142 (1996). The district *279 court’s factual findings are fully supported by the written testimony submitted by the plaintiffs, and those factual findings provide sufficient support to consider the plaintiffs’ legal claims. See University of Texas, 451 U.S. at 395.
We therefore accept these factual findings made by the district court for the purposes of our present review:
“Senate Bill 95 prohibits the performance on a living fetus of an abortion procedure described in the Act as ‘dismemberment abortion,’ defined as a procedure done:
with the purpose of causing the death of an unborn child, knowingly dismembering a living unborn child and extracting such unborn child one piece at a time from the uterus through the use of clamps, grasping forceps, tongs, scissors or similar instruments that, through the convergence of two rigid levers, slice, crash or grasp a portion of the unborn child’s body in order to cut or rip it off.
S.B. 95 § 2(b)(1) [since codified at K.S.A. 2015 Supp. 65-6742(b)(l)].
“Violation of the ban is a criminal offense.. . .
“Although ‘dismemberment abortion’ is not a medical term, the parties agree and the Court finds that the Act prohibits Dilation & Evacuation (‘D & E’) procedures. The D & E procedure is used for 95% of the abortions done in the second trimester.
“The plaintiffs in this case are Hodes & Nauser, M.D.s, PA- Dr. Herbert C. Hodes; and Dr. Traci Lynn Nauser, on behalf of themselves and their patients. The Plaintiff physicians are board-certified obstetrician-gynecologists who practice in Overland Park, Kansas. They provide pre-viability second-trimester abortions using D & E procedures. The Plaintiffs do not induce fetal demise prior to their D & E procedures.
[[Image here]]
“Defendants propose three alternative procedures to D & E: labor induction, induction of fetal demise using an injection, and induction of fetal demise using umbilical cord transection.
“Labor induction is used in approximately 2% of second-trimester abortion procedures. It requires an inpatient labor process in a hospital that will last between 5-6 hours up to 2-3 days, includes increased risks of infection when compared to D & E, and is medically contraindicated for some women.
“There is no established safety benefit to inducing demise prior to a D & E procedure.
“An injection of digoxin may be administered via either transabdominal or transvaginal injection. Injections to induce demise using digoxin prior to D & E are not practiced prior to 18 weeks gestation, and the impact of subsequent doses *280 of digoxin, required in cases where a first dose is not effective, is virtually unstudied. Research studies have shown increased risks of nausea, vomiting, extramural delivery, and hospitalization.
“Umbilical cord transection prior to a D & E is not possible in every case. Requiring transection prior to a D & E increases procedure time, makes the procedure more complex, and increases risks of pain, infection, uterine perforation, and bleeding. The use of transection to induce fetal demise has only been discussed in a single retrospective study, the authors of which note that its main limitation is ‘a potential lack of generalizability.’”
For the purpose of considering whether the district court properly entered its temporary injunction, we will now proceed to analyze the legal issues based on tírese factual findings. We recognize that the district court may well make different factual findings after each side presents its full evidence at trial. Our analysis at this stage of the litigation is therefore necessarily tentative, as it is based on the tentative factual findings now in place.
Analysis
The parties agree that whether the Kansas Constitution recognizes any right to abortion is a purely legal question that we must answer to resolve this appeal. That question and two others guide our analysis.
The central issue we must decide is whether the Kansas Constitution provides any abortion rights. If not, then this new Kansas statute should be allowed to go into effect, as the plaintiffs have raised only Kansas constitutional rights as the basis for an injunction.
If the Kansas Constitution does provide some abortion rights, we must then answer two other questions. First, we would have to determine the standard we would apply to decide whether those rights have been violated. That also is a purely legal question. Next, we would apply that standard to the facts as found by the district court to determine whether this new statute would violate those rights. In doing so, we would also take into account the standards that apply when a plaintiff seeks injunctive relief (i.e., a court order commanding or preventing some action, here preventing the new law from taking effect).
*281 To obtain an injunction—even a temporary one—-a plaintiff must make five showings to the court: (1) a substantial likelihood of eventually prevailing on the merits; (2) a reasonable probability that irreparable injury would take place without an injunction; (3) the lack of an adequate legal remedy (such as damages); (4) that the threat of injury outweighs whatever harm the injunction may cause tire opposing party; and (5) that the injunction will not be against the public interest. Downtown Bar and Grill v. State, 294 Kan. 188, 191, 273 P.3d 709 (2012). In this case, however, at least for the purposes of this appeal, the State has focused exclusively on the first of those required showings—substantial likelihood of success on the merits. The State does so by arguing that the Kansas Constitution does not provide the right to an abortion and that even if it did, and even if that right brings into play the same standards now applied under the United States Constitution, the new statute would not violate those standards and accordingly should still be allowed to take effect. We therefore focus on whether there is an abortion right under the Kansas Constitution and, if so, whether the new statute would violate that right.
We review the grant or denial of a temporary injunction only for an abuse of discretion. Downtown Bar and Grill, 294 Kan. at 191. Even though that is often a quite deferential review, a court abuses its discretion if it bases its ruling on a legal error. Kansas City Power & Light Co. v. Strong, 302 Kan. 712, 729, 356 P.3d 1064 (2015). And our review of legal issues must be independent, without any required deference to the district court. Downtown Bar and Grill, 294 Kan. at 191-92. Thus, our primary role in this appeal is to answer the purely legal questions we have identified concerning whedier the plaintiffs are likely to succeed on their claim that the statute violates the Kansas Constitution.

Under Established Kansas Supreme Court Caselaw, the Kansas Constitution Recognizes a Right to Abortion.

So we begin with whether the Kansas Constitution recognizes any right to abortion. On this question, we are guided primarily by two sources—the text of the sections of the Kansas Constitution cited by the plaintiffs and the caselaw of the Kansas Supreme Court interpreting those provisions.
*282 The plaintiffs rely on sections 1 and 2 of tire Kansas Constitution Bill of Rights. Section 1 provides: “All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness.” Section 2 provides: “All political power is inherent in the people, and all free governments are founded on their authority, and are instituted for their equal protection and benefit.”
Of course, we are not the first to consider these provisions— the Kansas Supreme Court has done so on many occasions; it is the final arbiter when interpreting the Kansas Constitution, including determining whether a statute violates that constitution. Harris v. Shanahan, 192 Kan. 183, 206-07, 387 P.2d 771 (1963). And as we noted in the introduction to this opinion, the Kansas Supreme Court has said in seven different cases stretching from 1917 through 2005 that it gives tírese Kansas constitutional provisions “much the same effect” as the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Limon, 280 Kan. at 283; Parrish, 257 Kan. 294, Syl. ¶ 5; Kansas City, 230 Kan. at 426; Manzanares, 214 Kan. at 602; Henry, 213 Kan. at 752-53; TriState Hotel Co., 195 Kan. 748, Syl. ¶ 1; Wilson, 101 Kan. at 795-96. More recently, our Supreme Court noted that “at least for the past half-century, [it] has generally adopted the United States Supreme Court’s interpretation of corresponding federal constitutional provisions as the meaning of the Kansas Constitution, notwithstanding any textual, historical, or jurisprudential differences.” State v. Lawson, 296 Kan. 1084, 1091, 297 P.3d 1164 (2013).
The State argues that the words “due process” do not appear in sections 1 and 2 of the Kansas Constitution Bill of Rights, and that’s obviously true. Even so, not only has our Supreme Court interpreted sections 1 and 2 to provide a due-process right, but section 1 contains language—the right to “liberty”—that fits squarely within both the federal abortion-rights cases and the broader substantive-due-process caselaw within which the federal constitutional right to abortion has taken form.
Both the Fifth Amendment (applicable to the federal government) and the Fourteenth Amendment (applicable to the states) to the United States Constitution provide that no person shall be *283 deprived “of life, liberty, or property, without due process of law.” These due-process provisions have long been interpreted not only to require that the government provide fair procedures when key rights are at stake but also to protect some key substantive rights from government interference—thus the term substantive due process.
In Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992), an abortion-rights case, the Court provided an overview of these substantive-due-process rights. It explained that the right to abortion was derived from the word “liberty,” just like the Court s other substantive-due-process caselaw:
“Constitutional protection of the woman’s decision to terminate her pregnancy derives from the Due Process Clause of the Fourteenth Amendment. It declares that no State shall ‘deprive any person of life, liberty, or property, without due process of law.’ The controlling word in the cases before us is iiberty.’ Although a literal reading of the Clause might suggest that it governs only the procedures by which a State may deprive persons of liberty, for at least 105 years, since Mugler v. Kansas, 123 U.S. 623, 660-661 (1887), the Clause has been understood to contain a substantive component as well, one ‘barring certain government actions regardless of the fairness of the procedures used to implement them.’ Daniels v. Williams, 474 U.S. 327, 331 (1986). As Justice Brandéis (joined by Justice Holmes) observed, ‘[djespite arguments to tire contrary which had seemed to me persuasive, it is settled that the due process clause of the Fourteenth Amendment applies to matters of substantive law as well as to matters of procedure. Thus all fundamental rights comprised within the term liberty are protected by the Federal Constitution from invasion by tire States.’ Whitney v. California, 274 U.S. 357, 373 (1927) (concurring opinion).” (Emphasis added.) Casey, 505 U.S. at 846-47.
In the first case the Court referred to, the 1887 case of Mu-gler v. Kansas, the Court considered whether Kansas statutes that made it a crime to manufacture intoxicating liquor violated a right to liberty that would allow a person to make liquor for his or her own use. The Court said there was a substantive limit to legislation that could be enacted for public health, morals, or safety: “It does not at all follow that every statute enacted ostensibly for the promotion of these ends is to be accepted as a legitimate exertion of the police powers of the State. There are, of necessity, limits beyond which legislation cannot rightfully go.” 123 U.S. at 661. In Mugler, however, the State of Kansas had not gone beyond *284 appropriate limits, as the Court noted the strong need to protect “the community against the evils which confessedly result from the excessive use of ardent spirits.” 123 U.S. at 662.
In the early twentieth centuiy, the United States Supreme Court found that a number of economic and social-welfare regulations unconstitutionally interfered with the protected interest in liberty. See 2 Rotunda & Nowak, Treatise on Constitutional Law: Substance and Procedure §§ 15.2-15.4 (5th ed. 2012); Barron & Dienes, Constitutional Law in a Nutshell, pp. 216-25 (8th ed. 2013). The most famous of these cases was Lochner v. New York, 198 U.S. 45, 53, 64, 25 S. Ct. 539, 49 L. Ed. 937 (1905), where the court invalidated a state law limiting bakery employees to no more than 10 hours of work per day and 60 hours per week, concluding that “[t]he right to purchase or to sell labor is part of the liberty protected” by the Fourteenth Amendment’s Due Process Clause.
Later, beginning with Nebbia v. New York, 291 U.S. 502, 538-39, 54 S. Ct. 505, 78 L. Ed. 940 (1934), which upheld New York’s minimum-price law for milk, the Court began a retreat from its close scrutiny of economic regulations. Today, unless equal-protection principles or fundamental rights are at stake, courts apply a much less rigorous test, approving state economic or social-welfare regulations so long as they are rationally related to a legitimate governmental interest. E.g., Williamson v. Lee Optical Co., 348 U.S. 483, 486-88, 75 S. Ct. 461, 99 L. Ed. 563 (1955) (upholding Oklahoma regulation of opticians where regulation might have been “a rational way to correct” a problem); Manzanares v. Bell, 214 Kan. 589, Syl. ¶¶ 7-8, 522 P.2d 1291 (1974) (stating that whether the Kansas no-fault insurance law “violates the due process clause is determined by whether its provisions bear a reasonable relation to a permissible legislative objective”; applying the Due Process Clauses in both United States and Kansas Constitutions); see State ex rel. Schneider v. Liggett, 223 Kan. 610, 613-15, 576 P.2d 221 (1978); Rotunda & Nowak at § 15.4(e); Barron & Dienes, pp. 221-25.
Although substantive due process is no longer used to overturn any reasonable economic regulation, it has become the basis for constitutional rights related to privacy, marriage, family, and procreation—none of which are specifically mentioned in the United *285 States Constitution. The Court has recognized the right to the use of contraceptives in Griswold v. Connecticut, 381 U.S. 479, 481-85, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965), the right to interracial marriage in Loving v. Virginia, 388 U.S. 1, 12, 87 S. Ct. 1817, 18 L. Ed. 2d 1010 (1967), the right to live with ones extended family, notwithstanding a city’s zoning laws in Moore v. East Cleveland, 431 U.S. 494, 503-06, 97 S. Ct. 1932, 52 L. Ed. 2d 531 (1977) (plurality opinion), the right to refuse medical treatment in Cruzan v. Director, Missouri Dept. of Health, 497 U.S. 261, 278, 110 S. Ct. 2841, 111 L. Ed. 2d 224 (1990), the right of a fit parent to raise his or her children without state interference in Troxel v. Granville, 530 U.S. 57, 65-66, 68-69, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (plurality opinion), and, most recently, the right of a same-sex couple to marry in Obergefell v. Hodges, 576 U.S. _, 135 S. Ct. 2584, 2604-05, 192 L. Ed. 2d 609 (2015).
And, of course, the Court first recognized a right to abortion in Roe v. Wade, 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973). The Roe Court discussed two bases for its conclusion that a right to privacy protected certain decisions a woman would make in terminating a pregnancy, but it relied primarily on the liberty interest found in the Fourteenth Amendment:
“This right of privacy, whether it be founded in the Fourteenth Amendment’s concept of personal liberty and restrictions upon state action, as we feel it is, or, as the District Court determined, in the Ninth Amendment’s reservation of rights to the people, is broad enough to encompass a woman’s decision whether or not to terminate her pregnancy.” (Emphasis added.) 410 U.S. at 153.
Later cases have squarely tied the right to abortion to this liberty interest: The Casey opinion does so most clearly. In addition to the quotation we have already included in our opinion (“The controlling word in the cases before us is ‘liberty.’” 505 U.S. at 846), the Courts opinion squarely relied on a liberty interest under the Due Process Clause:
“It is a promise of the Constitution that there is a realm of personal liberty which the government may not enter. . ..
[[Image here]]
“Our law affords constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education. . . . These matters, involving the most intimate and personal choices a *286 person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define ones own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State.” 505 U.S. at 847-51.
The State argues that none of this matters because “[n]o Kansas court has found that the Kansas Constitution includes a right of substantive due process . . . On that point, the State is simply wrong.
One year before the Lochner decision, in Brick Co. v. Perry, 69 Kan. 297, 76 Pac. 848 (1904), our Supreme Court struck down a Kansas statute making it unlawful to prevent employees from joining or belonging to a labor union. The court first noted that the defendant had claimed the law in question violated both the Fourteenth Amendment to the United States Constitution and section 1 of the Kansas Constitution Bill of Rights. 69 Kan. at 298-99. The court said there had been “an epidemic of this class of legislation” in the past two decades and that such laws had “been universally held to be a denial of rights guaranteed by the provisions of the national and state constitutions.” 69 Kan. at 301-02. The court said that the statute was unconstitutional, 69 Kan. at 305, because the employer was “at liberty to contract for the services of persons in any manner that is satisfactory to both” and that “[n]o legislative restrictions can be imposed on the lawful exercise of these rights.” 69 Kan. at 301.
Other Kansas Supreme Court decisions have also. measured Kansas statutes against the substantive-due-process standards found in sections 1 and 2 of the Kansas Constitution Bill of Rights.
In State v. Wilson, 101 Kan. 789, 168 Pac. 679 (1917), tire court upheld a statute limiting the use of trading stamps without payment of a license tax. The court specifically noted that it was applying sections 1 and 2 of the Kansas Constitution, which it said “are given much the same effect as the clauses of the fourteenth amendment relating to due process of law and equal protection.” 101 Kan. at 795-96. The court said that more than 50 court decisions had found trading-stamp laws invalid but that the United States *287 Supreme Court had very recently upheld them in two cases. Relying upon the United States Supreme Courts interpretation of the Fourteenth Amendment, our court concluded: “We acquiesce in the view of the federal supreme court that there is sufficient room for a reasonable difference of opinion as to whether the ‘premium system’ [used in trading stamps] is attended with evil consequences to the public, to place the affirmative decision of that question by the legislature beyond the reach of the courts ...101 Kan. at 800.
More recently, in Manzanares, 214 Kan. 589, the court considered the constitutionality of the Kansas no-fault insurance law. The court noted that “the Kansas Constitution’s counterpart of the Fourteenth Amendment is Sections 1 and 2 of our Bill of Rights,” 214 Kan. at 610, and the court concluded that the provisions of the law did “not violate the due process clause of either the Fourteenth Amendment to the Constitution of the United States or Sections 1 and 2 of the Bill of Rights of the Kansas Constitution.” 214 Kan. 589, Syl. ¶ 8.
In sum, the Kansas Supreme Court has explicitly recognized a substantive-due-process right under the Kansas Constitution and has applied a substantive-due-process legal standard equivalent to die one applicable under the Fourteenth Amendment at the time of these Kansas decisions. See also Gilbert v. Mathews, 186 Kan. 672, 677, 686, 352 P.2d 58 (1960) (striking down a statute regulating the sale of new goods at public auction by itinerant sellers as a violation of the federal and state constitutions,'citing section 1 of the Kansas Constitution Bill of Rights and the Fourteenth Amendment as the governing authorities). What the Kansas Supreme Court has not yet done is apply substantive-due-process principles in a case involving personal or fundamental rights, like the right to contraception, die right to marry, or the right to abortion.
As far as we are aware, die court has only been asked to do so once—in Alpha Med. Clinic v. Anderson, 280 Kan. 903, 128 P.3d 364 (2006), a case in which the court had to balance abortion rights and privacy interests against governmental investigatory powers. The Alpha Med. Clinic court noted the federal constitutional right to obtain an abortion widiout the government imposing an undue burden on that right. 280 Kan. at 920. The court then responded *288 to a party’s request that it also recognize the same right under the Kansas Constitution, declining to do so since it had already recognized tire federal right:
“We have not previously recognized—and need not recognize in this case despite petitioners’ invitation to do so—that such [abortion] rights also exist under the Kansas Constitution. But we customarily interpret its provisions to echo federal standards. [Citations omitted.]” 280 Kan. at 920.
The court’s final sentence—noting that it “customarily interpret[s]” Kansas constitutional provisions “to echo federal standards”—was unnecessary to the Alpha Med. Clinic decision and certainly is consistent with our understanding of its approach in substantive-due-process decisions from the early twentieth century to the present. But we do not recognize a right to abortion under the Kansas Constitution based on that hint from Alpha Med. Clinic. We do so because the Kansas Supreme Court has consistently interpreted sections 1 and 2 of the Kansas Constitution Bill of Rights as equivalent to the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Because the right to abortion is part of the liberty protected by the Due Process Clause to the Fourteenth Amendment, the Kansas Constitution provides the same right to abortion that is protected under federal law.
Before we conclude this section of the opinion, we should address one other argument the State has made against recognizing a right to abortion under sections 1 and 2 of the Kansas Constitution Bill of Rights—that the framers of the Kansas Constitution (who, we note, were all men) surely did not intend to create an abortion right in 1859, when the constitution was adopted. That may be true, but it has been recognized since before Kansas joined the Union that, as a matter of constitutional interpretation, the intent of the drafters with respect to broadly written rights is not the end of the matter. As Chief Justice John Marshall said, “[W]e must never forget, that it is a constitution we are expounding,” “a constitution intended to endure for ages to come, and, consequently, to be adapted to the various crises of human affairs.” McCulloch v. State of Maryland, 17 U.S. (4 Wheat.) 316, 407, 415, 4 L. Ed. 579 (1819). So it has been in practice with the Due Process Clause, where new applications, unforeseen to die drafters, have arisen over time, like *289 the right to contraception, the right to marry, and the right to abortion. So too with the prohibition on cruel and unusual punishment, where “evolving standards of decency” have been recognized under both the United States and Kansas Constitutions. See Graham v. Florida, 560 U.S. 48, 58, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010); State v. DeCourcy, 224 Kan. 278, 283, 580 P.2d 86 (1978).
We could go on with other examples, but neither the United States Supreme Court nor the Kansas Supreme Court has limited its interpretation of broadly worded federal and state constitutional provisions only to what was initially intended. Just last year, the United States Supreme Court once again quite clearly embraced this notion of constitutional interpretation in its Ohergefell opinion, which determined that there was a right under the Due Process Clause to same-sex marriage:
“The nature of injustice is that we may not always see it in our own times. The generations that wrote and ratified the Bill of Rights and the Fourteenth Amendment did not presume to know tire extent of freedom in all of its dimensions, and so they entrusted to future generations a charter protecting the right of all persons to enjoy liberty as we learn its meaning. When new insight reveals discord between the Constitution's central protections and a received legal stricture, a claim to liberty must be addressed.” 135 S. Ct. at 2598.
The Kansas Supreme Court has made much the same point:
• ‘We are aware of the fact that constitutions and their interpretation should march abreast of the times. Words must yield to the pressure of changed social conditions, more enlightened ideals, advanced business organizations and the general march of progress.” Markham v. Cornell, 136 Kan. 884, 891, 18 P.2d 158 (1933).
• “Until repealed or amended by the legislature, statutes stand immovable; constitutions march, aided by judicial interpretation necessarily employed to give full force and effect to the rights and privileges guaranteed by their general terms.” Postlethwaite v. Edson, 102 Kan. 619, 643, 171 Pac. 769 (1918).
See also Gannon v. State, 298 Kan. 1107, 1155-56, 319 P.3d 1196 (2014) (noting that courts are regularly called upon to define and apply imprecise constitutional standards and that the understanding *290 of these general standards—such as “cruel and unusual” or “equal protection”'—may be refined over time).
From all of this, we discern a simple proposition: The rights of Kansas women in 2016 are not limited to those specifically intended by the men who drafted our states constitution in 1859.

We Apply the Undue-Burden Test Announced in Casey to Determine Whether the Kansas Constitutions Right to Abortion Has Been Violated.

We next determine what standard we should apply to decide whether this new Kansas statute violates the abortion right provided under the Kansas Constitution. Since we have concluded that Kansas would apply the same due-process standards that the United States Supreme Court applies under the Fourteenth Amendment, we must first determine what those federal standards are.
Three United States Supreme Court cases are central here: Casey; Stenberg v. Carhart, 530 U.S. 914, 120 S. Ct. 2597, 147 L. Ed. 2d 743 (2000); and Gonzales v. Carhart, 550 U.S. 124, 127 S. Ct. 1610, 167 L. Ed. 2d 480 (2007). In Casey, the Court announced an “undue burden” standard to apply in determining whether an abortion-rights restriction is constitutional. 505 U.S. at 876-78 (plurality opinion). While that portion of the Casey opinion was adopted by only three justices (with two others adopting a more stringent test), a majority of the Court applied the Casey undue-burden test in Stenberg, 530 U.S. at 921, and Gonzales, 550 U.S. at 146. In addition, our Supreme Court recognized this as the applicable test in Alpha Med. Clinic. 280 Kan. at 920 (recognizing “the fundamental right of a pregnant woman to obtain a lawful abortion without government imposition of an undue burden on that right”) (citing Casey). We therefore apply the undue-burden test here.
An undue-burden finding, as described in Casey, “is a shorthand for tire conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.” 505 U.S. at 877. The plaintiffs in our case have primarily argued that the new Kansas statute is unconstitutional based on its effect. A statute that furthers a valid state interest but “has die effect of placing a substantial obstacle in *291 the path of a womans choice cannot be considered a permissible means of serving its legitimate ends.” 505 U.S. at 877.

Under the District Court’s Factual Findings, the Plaintiffs Have Shown a Substantial Likelihood That the New Kansas Statute Violates the Kansas Constitution.

So far, we have determined that the Kansas Constitution does recognize an abortion right and that we should apply the undue-burden standard to determine whether that right has been violated. We must now determine whether the plaintiffs have made a sufficient showing that the statute would violate that standard to obtain a temporaiy injunction. To do so, the plaintiffs must demonstrate a substantial likelihood that they will ultimately prevail on this question. Downtoion Bar and Grill v. State, 294 Kan. 188, 191, 273 P.3d 709 (2012).
Given the district court’s factual findings and the procedural status in which the case has reached us (a request for temporaiy injunction), tire plaintiffs have made that showing. We reach this conclusion primarily based on the holdings of Stenberg and Gonzales.
In Stenberg, the Court found unconstitutional a Nebraska statute that the Court interpreted as banning both D & E and intact D & E abortions. 530 U.S. at 921-22, 938, 945-46. In Gonzales, the Court upheld a ban on only intact D & E abortions, finding that this limited ban did not constitute an undue burden and noting that D & E abortion, the most common type of second-trimester abortion and “’generally the safest method of abortion during the second trimester,”’ remained legal. 550 U.S. at 164 (quoting Carhart v. Ashcroft, 331 F. Supp. 2d 805, 1031 [D. Neb. 2004]).
Kansas has banned the intact D & E abortion procedure since 1998. See K.S.A. 2014 Supp. 65-6721; L. 1998, ch. 142, sec. 18; L. 2011, ch. 91, sec. 30. By combining that ban with a new one on the D & E abortion procedure, Kansas has simply attempted to do in two statutes what the United States Supreme Court held Nebraska could not do in one—ban both D & E and intact D & E abortions.
The State contends, based on Gonzales, that the new Kansas statute is permissible because reasonable alternative procedures remain available. But the circumstances here are quite unlike *292 Gonzales. There, the Court considered a ban on an uncommon procedure and noted that the most common and generally safest abortion method remained available. Here, the State has done tire opposite, banning the most common, safest procedure and leaving only uncommon and often unstudied options available.
The State has offered three alternatives to the standard D & E procedure: labor-induced abortion, inducing fetal demise with digoxin injections, and inducing fetal demise by cutting the umbilical cord (also known as transection). The district court found that the State did not challenge the basic facts the plaintiffs submitted about these alternatives. In its reply brief on appeal, the State takes issue with this conclusion and states that it “cited numerous medical studies and journals to contradict Plaintiffs’ assertions.”
As we explained when we set out the district court’s factual findings, we must accept those findings for the purposes of our decision here. This case is before the court on a temporary injunction, and the only evidence the district court received was written testimony the plaintiffs submitted from three physicians. Accordingly, it is possible that the district court will make different factual findings after both sides present their evidence at trial. In the meantime, we must rule based on tire record as it exists. With that background, we will briefly review each of the alternative procedures the State argues are available in place of the standard D & E procedure.
First, the State does not dispute the plaintiffs’ contention that labor-induction abortion is used in only 2% of second-trimester abortions in the United States. While the State notes that labor induction is generally safe and is the preferred method in some other countries, it hasn’t disputed the plaintiffs’ assertions that it is not medically recommended for some women, that it includes an increased risk of infection, and that it requires a hospital stay of anywhere from 5 hours to 3 days. Of course, the woman also must go through labor.
Second, the State does not dispute that digoxin injections to induce fetal demise are only rarely used before 18 weeks gestation (while D & E abortions are often used beginning at 14 weeks). The State also does not dispute that the procedure sometimes requires multiple injections and that the effect of multiple injections hasn’t *293 been studied. The State acknowledges that digoxin injections create a risk of extramural delivery (unplanned fetal expulsion when the woman is not at a medical facility). In addition, the district court found that digoxin use caused increased risks of nausea, vomiting, and hospitalization.
Third, the district court found that umbilical-cord transection wasn’t possible in all cases; that it increased the risk of pain, infection, uterine perforation, and bleeding; and that it increased the time required for the abortion. In response, the State cited one study that looked at umbilical-cord transection; while the study found that tire procedure was safe, its authors noted that the results couldn’t necessarily be generalized.
The State does not argue that these alternatives provide any safety benefit to the woman—the State simply argues that regardless of the additional risks, costs, and time that they impose, the alternatives are not an “undue burden.” The board-certified physicians who provided testimony to the district court have never routinely induced fetal demise before performing a D & E abortion. Given the additional risk, inconvenience, discomfort, and potential pain associated with these alternatives, some of which are virtually untested, we conclude that banning the standard D & E, a safe method used in about 95% of second-trimester abortions, is an undue burden on the right to abortion.
Kansas courts presume that a properly enacted statute is constitutional, and the party claiming otherwise must prove its case. Downtown Bar and Grill, 294 Kan. at 192; State ex rel. Schneider v. Liggett, 223 Kan. 610, 616, 576 P.2d 221 (1978). Based on the district court’s factual findings, along with Casey, Stenberg, and Gonzales, the plaintiffs have done so here. The district court properly found that tire plaintiffs had shown a substantial likelihood of prevailing on tire merits in this lawsuit.
As we noted previously, the State has not challenged in its appellate brief the district court’s conclusion that the plaintiffs had met the other requirements for a temporary injunction (irreparable harm, lack of adequate legal remedy, balance of harms in plaintiffs’ favor, and injunction not adverse to public interest). Accordingly, *294 the district court properly entered a temporary injunction so that the law would not take effect pending the full presentation of evidence at trial and a final decision by the district court.
Conclusion
We conclude with four final observations about the resolution of this case in our court.
First, we are not called upon in this case to announce, or to act upon, our own personal views regarding abortion. As the United States Supreme Court said in Casey:
“Men and women of good conscience can disagree, and we suppose some always shall disagree, about the profound moral and spiritual implications of terminating a pregnancy, even in its earliest stage. Some of us as individuals find abortion offensive to our most basic principles of morality, but that cannot control our decision. Our obligation is to define the liberty of all, not to mandate our own moral code.” Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 850, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992).
We have done our best to carry out that obligation to define the liberty of all—squarely based on tire precedents of the Kansas Supreme Court and the United States Supreme Court, which we are required to apply—and not to mandate our own moral code or religious beliefs.
Second, this is the first case in which a Kansas appellate court has been required to decide whether the Kansas Constitution provides a right to abortion. That’s because this is the first time a plaintiff has brought such a claim solely under the state constitution— even though the federal Constitution provides an abortion right. A plaintiff has the procedural right to choose the legal theories he or she will pursue; we cannot force the plaintiffs here to choose another legal avenue. See The Fair v. Kohler Die Co., 228 U.S. 22, 25, 33 S. Ct. 410, 57 L. Ed. 716 (1913) (Holmes, J.) ("Of course, the party who brings a suit is master to decide what law he will rely upon ... .”); Xpedior Cred. Trust v. Credit Suisse First Boston, 341 F. Supp. 2d 258, 268 (S.D.N.Y. 2004) (“The choice of legal theories is a strategic choice to be made by plaintiff, and neither the court nor the defendant is permitted to override that choice.”); Golden v. Den-Mat Corporation, 47 Kan. App. 2d 450, 463, 276 P.3d 773 (2012) (“A plaintiff may assert some available theories *295 but not others. And the plaintiff may pick and choose at his or her discretion so long as the defendant has been fairly apprised of the circumstances.”).
Third, our court is equally divided, seven voting to affirm the district court and seven voting to reverse. When an appellate court is equally divided, the trial court’s ruling is affirmed. Paulsen v. U.S.D. No. 368, 239 Kan. 180, 182, 717 P.2d 1051 (1986); see Neil v. Biggers, 409 U.S. 188, 191-92, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972).
Fourth, although our court is equally divided, we believe we have still fulfilled our role in the Kansas justice system. An intermediate appellate court never has the final say; our ruling in this case will almost surely be reviewed at some point by tire Kansas Supreme Court. In its review, the Kansas Supreme Court will have the benefit of the independent and careful review that all of our judges have provided to the issues presented and the lessons to be learned from prior Kansas and federal cases. In the meantime, the parties must have a result, and we have provided that as well.
Pierron, McAnany, Buser, Standridge, and Arnold-Burger, JJ., join in the foregoing opinion.
# # #