No. 129,466

# IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CITY OF LEAVENWORTH, KANSAS,
*Appellee*,

v.

CORECIVIC, INC.,
*Appellant*,

and

MISTY LINN MACKEY,
*Defendant.*

## SYLLABUS BY THE COURT

1.

Temporary injunctions are provisional remedies intended to maintain the status quo and prevent harm to a claimed right pending a final determination of the controversy on its merits. They are not meant to determine any controverted right but to prevent injury to a claimed right until a full decision can be made.

2.

To obtain temporary injunctive relief, the requesting party must show: (1) a substantial likelihood of success on the merits; (2) a reasonable probability of irreparable future injury; (3) an action at law will not provide an adequate remedy; (4) the threatened injury outweighs whatever damage the proposed injunction may cause the opposing party; and (5) the injunction, if issued, would not be adverse to the public interest.

Appeal from Leavenworth District Court; JOHN J. BRYANT, judge. Oral argument held February 10, 2026. Opinion filed February 27, 2026. Affirmed.

*Sara A. Fevurly* and *Taylor Concannon Hausmann*, of Husch Blackwell LLP, of Kansas City, Missouri, for appellant.

*W. Joseph Hatley* and *Angus W. Dwyer*, of Spencer Fane LLP, of Kansas City, Missouri, and *David E. Waters* and *Caleb P. Phillips*, of the same firm, of Overland Park, for appellee.

Before WARNER, C.J., MALONE and HILL, JJ.

MALONE, J.: CoreCivic, Inc., appeals the district court's order for a temporary injunction prohibiting it from housing noncitizen detainees at its detention facility in the City of Leavenworth without first applying for and obtaining a special use permit from the Leavenworth City Commission. After thoroughly reviewing the record and considering the parties' arguments, we affirm the district court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1992, CoreCivic, Inc. (CoreCivic), a for-profit corporation, began operating a private prison and detention facility in the City of Leavenworth (the City). The detention facility, known as the Midwest Regional Reception Center (MRRC), was mainly used to house pretrial detainees for the United States Marshals Service. When CoreCivic began operating the facility, it did so without any permit from the City.

In 2012, the City adopted Development Regulations Ordinance No. 7911, which amended the City's then-effective development regulations and prohibited the operation of a jail or prison without receiving a special use permit. Under Ordinance No. 7911, a party whose property was to be used for a special use—as defined in the Development Regulations—was required to submit an application and supporting documentation to the Leavenworth City Commission before using the property in that manner. The application

process included notice requirements, a hearing before a planning commission, and a public hearing before the issuance of any special use permit.

But CoreCivic was not required to apply for a special use permit to continue using its property because it already was using the MRRC as a detention facility when the City enacted the Development Regulations. Section 1.05.E.2 of the Development Regulations provided: "Any existing legal use at the effective date of these Development Regulations which is designated as a special use by these Development Regulations shall be deemed as an existing special use and a lawful conforming use." That said, Section 2.04.C of the Development Regulations provided that if a property owner discontinued a special use for more than 12 months, the City Commission had the authority to rescind the ability to continue a special use. Section 1.05.D.8 of the Development Regulations also provided that if a "nonconforming use is abandoned for a period of twenty-four (24) consecutive months any subsequent use or occupancy of such land after this period shall comply with the regulations of the zoning district in which such land is located."

In 2021, CoreCivic's contracts to house detainees for the Department of Justice were not renewed. As of January 1, 2022, CoreCivic entirely stopped housing detainees at the MRRC. While CoreCivic ceased using the property to house inmates, it continued to employ maintenance workers, paid taxes on the property, and attempted to market the MRRC for use as a detention facility. In 2024, CoreCivic began negotiating with Immigration and Customs Enforcement (ICE) for the MRRC to serve as a holding facility for its detainees. CoreCivic informed the City authorities of this opportunity.

On February 21, 2025, CoreCivic applied for a special use permit to reactivate the MRRC as a detention facility. The written application was accompanied by a letter from CoreCivic's Chief Innovation Officer, explaining the company's opportunity for the contract with the federal government. The application explained that, on behalf of ICE,

3

the facility would "house approximately 1,000 detained noncitizens" at a time and that those noncitizens would be held "approximately 51 days as they are processed through the immigration system, including through removal hearings held at the facility." The Leavenworth City Planning Commission scheduled a public hearing on CoreCivic's application on April 7, 2025, with final hearings scheduled for the next month. But then, on March 13, 2025, CoreCivic withdrew its application, asserting that it did not need a permit and that it intended to house detainees on behalf of ICE without applying for one.

In response to CoreCivic's action, on March 25, 2025, the Leavenworth City Commission adopted Resolution No. B-2394, which stated that CoreCivic had discontinued or abandoned its use of the MRRC and that it was required to secure a special use permit to operate the facility as a prison again. The Ordinance listed two grounds for the City Commission's decision under the Development Regulations:

- "To the extent the Facility or the Property could be deemed to be or to have been a lawful nonconforming use, then pursuant to Sec. 1.05.D.8 of the Development Regulations, the Governing Body hereby finds that any use of the Facility and/or the Property as a jail or prison is no longer a lawful nonconforming use and that any use as a jail or prison shall and does require a special use permit as provided for in the City's Development Regulations, and that such uses must otherwise comply with all use regulations applicable to new uses in the I-2 zoning district."

- "To the extent the Facility or the Property could be deemed to have or to have had a special use permit or special use designation, then pursuant to Sec. 2.04.C of the Development Regulations, the Governing Body hereby administratively rescinds any and all special use permits or special use designations for the Facility and the Property as a jail and/or prison under City Code and the City's Development Regulations."

4

CoreCivic received this Resolution two days after it was adopted, but it did not file any appeal from the City Commission's decision. As of the week before the Resolution was passed, CoreCivic's own website listed the MRRC as being "currently inactive."

On March 31, 2025, the City sued CoreCivic in the United States District Court for the District of Kansas, seeking an injunction preventing CoreCivic from using the MRRC as a jail or prison without first obtaining a special use permit. See *City of Leavenworth, Kansas v. CoreCivic, Inc.*, No. 25-CV-02169-TC-BGS, 2025 WL 1474124 (D. Kan. 2025) (unpublished opinion). The federal court dismissed the City's case for a lack of subject matter jurisdiction, finding that it lacked diversity jurisdiction because the case did not involve the requisite amount in controversy. 2025 WL 1474124, at *3-4.

After its federal suit was dismissed, the City filed this action in Leavenworth District Court. The petition included five counts—(1) "Declaratory Judgment: Violation of the Development Regulations"; (2) "Injunctive Relief"; (3) "Public Nuisance"; (4) "Conspiracy"; and (5) "Against Defendant [Misty Lynn] Mackey and Doe Defendants: Aiding and Abetting CoreCivic"—and the petition sought "a temporary restraining order, preliminary injunction, and permanent injunction prohibiting [CoreCivic] from housing any detainees in the Facility without applying for and obtaining a special use permit in accordance with the procedures set forth in the City's Development Regulations." Along with its petition, the City moved the district court for a temporary injunction, pending a full determination on the merits, preventing CoreCivic from operating its facility as a jail or prison without applying for and obtaining a special use permit. The City also filed a memorandum in support of its motion for temporary injunction including sworn declarations and exhibits. CoreCivic filed a memorandum opposing the City's motion and the City filed a reply memorandum.

5

On June 4, 2025, the district court held a hearing on the City's motion and after listening to the parties' arguments issued a temporary injunction. The journal entry memorializing the ruling found that the City was likely to succeed on the merits of its request for a permanent injunction prohibiting CoreCivic from operating a prison or jail without a special use permit. The district court found the City would suffer irreparable harm in the absence of a temporary injunction because the City "must have the ability to regulate itself by enforcing its own laws." Next, the district court found that the City had "no adequate legal remedy due to the extreme difficulty of measuring damages that will accrue in the future." The district court concluded that the balance of harms weighed in favor of the City and that a temporary injunction favored the public interest. The district court declined to require the City to post a surety bond, explaining that it "believe[d] the City has the resources to pay should CoreCivic be awarded damages in the future."

CoreCivic timely appealed the district court's order for a temporary injunction. This court has jurisdiction over the appeal under K.S.A. 60-2102(a)(2). CoreCivic moved this court to stay the enforcement of the temporary injunction. After considering the City's response, this court denied CoreCivic's motion for a stay.

ANALYSIS

CoreCivic claims the district court erred by granting a temporary injunction prohibiting it from housing detainees at the City's facility without first obtaining a special use permit from the Leavenworth City Commission. The City disagrees, asserting the district court's decision to grant a temporary injunction was not an abuse of discretion.

CoreCivic organizes its claim into three issues. First, it argues the district court erred in finding the City established a substantial likelihood of success on the merits. Next, CoreCivic contends the district court erred in finding the City showed a reasonable

6

probability of any tangible, irreparable harm. Finally, CoreCivic argues the district court erred in finding that the City had no other adequate remedy, that the balance of harms weighed in its favor, and that the injunction was not adverse to the public interest.

"When a party alleges a district court erred in ruling on a motion for a temporary injunction, appellate courts review the decision for an abuse of discretion." *League of Women Voters of Kansas v. Schwab*, 318 Kan. 777, 788, 549 P.3d 363 (2024). An abuse of discretion will only be found where a district court's decision is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. 318 Kan. at 788. As the party challenging the grant of temporary injunctive relief, CoreCivic bears the burden of proving the district court abused its discretion. See *Steffes v. City of Lawrence*, 284 Kan. 380, 393, 160 P.3d 843 (2007).

Temporary injunctions "are provisional remedies intended to maintain the status quo and prevent harm to a claimed right pending a final determination of the controversy on its merits. They are not meant to determine any controverted right but to prevent injury to a claimed right until a full decision can be made." *State ex rel. Kobach v. Harper*, 65 Kan. App. 2d 680, 686, 571 P.3d 6 (2025). The purpose of a temporary injunction is to preserve the status quo—that is, "'the last actual, peaceable, noncontested position of the parties which preceded the pending controversy'"—until a final determination of the controversy can be made. *Garetson Brothers v. American Warrior, Inc.*, 51 Kan. App. 2d 370, 391, 347 P.3d 687 (2015). Because a temporary injunction allows a party to receive relief before a decision is made on the merits and before the parties are given a full opportunity to present their case, it is considered an extraordinary remedy, so the "'right to relief must be clear and unequivocal.'" *Harper*, 65 Kan. App. 2d at 691.

To obtain temporary injunctive relief, the requesting party must show: (1) a substantial likelihood of success on the merits; (2) a reasonable probability of irreparable future injury; (3) an action at law will not provide an adequate remedy; (4) the threatened injury outweighs whatever damage the proposed injunction may cause the opposing party; and (5) the injunction, if issued, would not be adverse to the public interest. *Downtown Bar and Grill v. State*, 294 Kan. 188, 191, 273 P.3d 709 (2012). While the absence of any of these factors is fatal to a request for a temporary injunction, courts typically give particular weight to the movant's likelihood of prevailing and the reasonable probability of irreparable injury. See *Steffes*, 284 Kan. at 395-96.

*Substantial likelihood of success on the merits*

To show a substantial likelihood of eventually prevailing, a party has the burden to establish that it is more likely than not to succeed on the merits of its claim. *Harper*, 65 Kan. App. 2d at 701. To the extent the question of whether the City is substantially likely to prevail depends on statutory interpretation, this court will review the district court's conclusion independently, without any required deference. See *Downtown Bar and Grill*, 294 Kan. at 191-92. And to the extent the district court's decision is dependent on findings of fact, this court will determine whether those findings were supported by substantial evidence. See *State ex rel. State Bd. of Healing Arts v. Thomas*, 33 Kan. App. 2d 73, 79, 97 P.3d 512 (2004).

CoreCivic argues the City failed to meet its burden to establish a substantial likelihood of success on the merits for several reasons. First, it contends the district court's decision disrupted the status quo. Second, CoreCivic argues the City could not use Section 2.04.C of the Development Regulations to rescind the grandfathered, designated special use status of the MRRC and, even if it could, there was no substantial evidence to support the conclusion that it had abandoned its use of the detention facility. Third,

CoreCivic asserts that under the Supremacy Clause, the City's revocation of its special use authorization was invalid because it was an attempt to impermissibly regulate the federal government's immigration policies by targeting its chosen contractor. Finally, CoreCivic argues the district court ignored the merits of its arguments against the City's adoption of Resolution No. B-2394 simply because CoreCivic did not separately appeal that decision under K.S.A. 12-760(a).

CoreCivic's initial point about the district court's alleged disruption of the status quo is a good starting point as it underscores an essential disagreement between the parties about what the status quo was before the City filed this lawsuit. CoreCivic contends "the last actual, peaceable, uncontested position of the parties was prior to the City's attempted administrative rescission of CoreCivic's status as a 'designated special use' pursuant to Section 2.04.C." That is, CoreCivic takes the position that the status quo the district court's issuance of the temporary injunction disrupted was not the state of the parties at the time the City filed the suit, but before the City rescinded its special use designation with Resolution No. B-2394.

The City takes the more tenable position that the status quo was, as the district court appears to have found, leaving the parties in the position they were in at the actual time the present suit was filed—that is, after the Resolution explicitly requiring CoreCivic to apply for a special use permit was passed. The district court's finding regarding the status quo is supported by substantial evidence and most accurately reflects the last peaceable, noncontested position of the parties. Thus, the district court's issuance of the temporary injunction preserved, rather than disrupted, the status quo.

Next, CoreCivic asserts the City could not use Section 2.04.C of the Development Regulations to rescind the grandfathered, designated special use status of the MRRC, and even if it could there was not substantial evidence to support the conclusion that it had

9

abandoned its use of the detention facility. The parties agree that CoreCivic's existing use of the MRRC was grandfathered as an existing special use when the City adopted its 2012 Development Regulations. The parties also agree that CoreCivic was never issued a written special use permit for its operation of the MRRC as a jail or prison.

The parties' disagreement lies in whether the City had the authority to rescind the MRRC's status under the Development Regulations. CoreCivic argues the Development Regulations only provide the authority to rescind a written special use permit, not grandfathered special use designations. The City asserts that the grandfathered special use designation as outlined in the Development Regulations created an implied special use permit, otherwise it would be left with no authority to review such uses. To examine the propriety of the City's Resolution rescinding CoreCivic's special exiting use, we must examine the language of the Development Regulations. This interpretation presents a question of law, subject to unlimited review. See *Robinson v. City of Wichita Employees' Retirement Bd. of Trustees*, 291 Kan. 266, 272, 241 P.3d 15 (2010).

A review of the plain language of the applicable provisions of the Development Regulations supports the City's position that it had the authority to rescind CoreCivic's existing special use designation. Section 2.04.C provides:

"*Discontinuance or Violation of Permit Conditions*:  A Special Use Permit may be granted by and continued annually by the City Commission, City of Leavenworth, Kansas. The continuation of a Special Use Permit exists with the property as long as such Special Use Permit is used in accordance with its original intended and approved purpose and the annual [Special Use Permit] fee is paid. Any discontinuance of more than 12 months, violation of permit conditions, or failure to pay a fee may enable the City Commission to administratively rescind a special use permit."

10

Essentially, Section 2.04.C provides the City a means to address situations where a property owner stops using their property in a manner that constitutes a special use. It places an objective time limit on how long a property owner could cease using its property for a special use before the City is given the authority to address the situation and administratively rescind the property's special use status. Notably, the plain language of Section 2.04.C contains no reference to a grandfathered, existing special use.

CoreCivic contends Section 2.04.C cannot apply because the provision only applies to entities that have a written special use permit, not grandfathered existing special uses. The City disagrees, asserting that Section 2.04.C must apply to grandfathered special uses because Section 1.05.E.2, which provides for the grandfathering of preexisting special uses, effectively created an implied special use permit. Section 1.05.E.2 provides:

> "*Status of Existing Legal Uses Designated as Special Uses*. Any existing legal use at the effective date of these Development Regulations which is designated as a special use by these Development Regulations *shall be deemed as an existing special use and a lawful conforming use*." (Emphasis added.)

To begin, this section is the only provision in the Development Regulations that addresses existing special uses—the terms "existing special use" and "lawful conforming use" are not defined or mentioned anywhere else in the Development Regulations. The City asserts that by deeming a preexisting special use as an "existing special use and a lawful conforming use," the Development Regulations essentially created an implied special use permit. This interpretation is supported by the fact that Section 2.04.A provides: "*All uses identified . . . as a special use* in any particular zoning district *shall require a special use permit*." (Emphases added.). In other words, any special use must have been accompanied by a permit, whether explicitly granted or implied.

11

If, as CoreCivic maintains, this was not the case, the City would be completely powerless to regulate any special uses that existed before the Development Regulations were enacted in 2012. Such a result would mean that CoreCivic's use of the MRRC—and any other company that operated property with a special use permit before the 2012 Development Regulations—would be essentially exempt from any oversight by the City based solely on the fact that it existed before the Development Regulations. Under CoreCivic's argument the City would be powerless to rescind a property's special use, no matter how long the property owner discontinued the use. Such an interpretation would be an unreasonable result. A more reasonable reading is that the Development Regulations simply provided that property owners with grandfathered, or preexisting special uses, did not need to go through the procedural hurdles of applying for a permit, not that they were operating without any permit and subject to no regulation.

Under the Development Regulations, when CoreCivic discontinued its use of the facility as a detention center for more than 12 months, it lost its implied permission to do so regardless of any intent to abandon the use. As these Development Regulations were drafted, we conclude that CoreCivic's permission to use the land as a prison arose not from a piece of paper but by its continuous use of the property as a prison beginning before the regulations were enacted. When CoreCivic failed to use the land as a prison for more than 12 months, the City could use Section 2.04.C of the Development Regulations to rescind CoreCivic's grandfathered, designated special use status of the MRRC.

Alternatively, CoreCivic argues that even if the City had the authority to administratively rescind the MRRC's special use designation, the City could not demonstrate that CoreCivic ever discontinued or abandoned its use of the facility as a jail or prison. CoreCivic contends no evidence supports any intent to abandon the facility nor any overt act or failure to act to maintain the MRRC as a detention facility, and that it has "consistently utilized, maintained, and marketed [its Leavenworth facility] since 1992."

12

Even though CoreCivic may have never intended to fully cease its operations at the facility and may have been attempting to resume housing detainees there, there was evidence to support that it had stopped using the MRRC as a jail or prison for at least two years. The Development Regulations define "Jails and Prisons" as "[p]laces in which people are physically confined and, usually, deprived of a range of personal freedoms." CoreCivic admits that it stopped confining individuals at the MRRC by January 2022. When viewed in this light, the evidence supports the district court's conclusion.

CoreCivic maintains that "a relatively brief vacancy period in CoreCivic's 30-year history, in the midst of a hostile administration and the COVID-19 pandemic, cannot reasonably be construed to imply that CoreCivic no longer claimed or retained any interest in continuing to operate its property as a detention center." While these may be valid explanations related to why the MRRC was not being used as a jail or prison as of January 2022, it does not negate the fact that the district court was presented with substantial evidence to support its factual finding that CoreCivic had discontinued its use of the MRRC as a jail or prison for over two years, despite the reason for that discontinuance. The City showed that it was more likely than not to prevail on the merits of its request for an injunction—the district court did not err in applying the applicable sections of the Development Regulations, and its factual finding about the discontinuance of the use of the MRRC as a jail or prison is supported by substantial evidence.

Turning to CoreCivic's Supremacy Clause argument, we first observe that the district court's ruling does not address any such defense. CoreCivic contends that the City's actions—in rescinding the MRRC's existing special use permit and seeking to enforce its zoning ordinances—violate the Supremacy Clause because they constitute interference with the federal government's operations. In short, CoreCivic attempts to wield the Supremacy Clause as a defense for why the City is not likely to succeed on the merits of its request for a permanent injunction.

13

Generally speaking, states are not permitted to interfere with or control the operations of the federal government. See *McCulloch v. Maryland*, 17 U.S. 316, 425-37, 4 L. Ed. 579 (1819). To enforce this principle, sometimes referred to as intergovernmental immunity, the United States Supreme Court has explained that the states cannot (1) regulate the United States government directly or (2) discriminate against it or its contractors. *United States v. Washington*, 596 U.S. 832, 838, 142 S. Ct. 1976, 213 L. Ed. 2d 336 (2022) (describing intergovernmental immunity as "prohibiting States from interfering with or controlling the operations of the Federal Government").

Here, there is nothing to suggest that the City is attempting to directly regulate the federal government by enforcing its zoning ordinances. The City is attempting to enforce its generally applicable permitting procedures, not regulate federal immigration policy and enforcement. Thus, CoreCivic's argument depends on whether the City's action can be fairly categorized as specifically discriminating against CoreCivic.

CoreCivic argues the City is "specifically targeting CoreCivic and regulating it unfavorably based on its partnership with ICE." But it provides no evidence to support its position. In looking at whether a state law or regulation is discriminating against the federal government or its contractors, the important consideration is if the state has "singled out contractors who work for the United States for discriminatory treatment." *Washington v. United States*, 460 U.S. 536, 544, 546, 103 S. Ct. 1344, 75 L. Ed. 2d 264 (1983); see *Dawson v. Steager*, 586 U.S. 171, 175-76, 139 S. Ct. 698, 203 L. Ed. 2d 29 (2019). There is nothing to suggest that CoreCivic is being singled out here. The City is merely attempting to enforce its zoning regulations that impose requirements on every entity regardless of its status as a contractor with the federal government. Because the record contains no evidence to suggest the City is discriminating against CoreCivic by seeking to enforce its zoning regulation, the Supremacy Clause does not affect the likelihood of the City being successful in its request for a permanent injunction.

14

Finally, CoreCivic argues the district court abused its discretion by failing to consider the merits of its arguments against the City's adoption of Resolution No. B-2394 simply because CoreCivic did not separately appeal that decision under K.S.A. 12-760(a). A full reading of the district court's decision refutes this argument. Although the district court pointed out that CoreCivic failed to appeal the City's adoption of Resolution No. B-2394, it cannot reasonably be said that the district court "performed no meaningful analysis of the underlying merits of the case," as CoreCivic asserts in its brief. The district court did not avoid the merits of the case; it adequately determined that the City had a reasonable probability of success on the merits, in part because CoreCivic's defense on the validity of the City's Resolution stood on potentially shaky procedural grounds.

In sum, CoreCivic has failed to show that the district court abused its discretion by concluding that, at this stage of litigation, the City is more likely than not to succeed on the merits of its claim. See *Harper*, 65 Kan. App. 2d at 701. Thus, the City adequately established this first factor in its request for a temporary injunction. That said, "[a] full hearing on the merits could easily change that balance." 65 Kan. App. 2d at 702.

*Reasonable probability of irreparable harm*

Next, CoreCivic contends the district court erred in finding that the City showed a reasonable probability of irreparable harm because there was no evidence that CoreCivic operating its Leavenworth facility without a special use permit would cause tangible harm to the City. The City argues, under K.S.A. 12-761(c), that the prospective violation of its zoning ordinances alone constitutes irreparable harm for which it could seek injunctive relief. Alternatively, the City maintains it showed a reasonable probability that it would suffer tangible, irreparable harm because it identified several public health and safety issues the last time CoreCivic operated the facility as a jail and CoreCivic offered no evidence the harm would not recur when operations resumed.

15

This court recently summarized the irreparable harm element as follows:

"In determining whether a party shows it will suffer an irreparable future injury, the party must only demonstrate that a 'reasonable probability' of injury exists. The 'reasonable probability' standard is a much lower burden than the applicable burden of proof at a trial. Requiring proof of certainty of irreparable harm is too high of a standard for parties seeking injunctions. Yet purely speculative harm will not suffice. Because an injunction is an equitable remedy, it does not issue automatically and is not meant '"to restrain an act the injurious consequences of which are merely trifling."' [Citations omitted.]" *Harper*, 65 Kan. App. 2d at 691.

In its order granting the temporary injunction, the district court found the City would "suffer irreparable harm in the absence of a temporary injunction because CoreCivic currently has no permit to operate and the City must have the ability to regulate itself by enforcing its own laws." The district court did not elaborate on its rationale, and neither party requested more detailed findings.

On appeal, CoreCivic asserts the only harm the City showed was speculative and premised solely on the City's allegation that CoreCivic intended to violate the City's zoning ordinances by operating the MRRC without a permit. CoreCivic alleges that the district court's analysis on this point effectively merges the irreparable injury requirement with the showing of a substantial likelihood of prevailing on the merits. CoreCivic's argument relies heavily on this court's recent decision in *Harper*, which held that "[i]rreparable harm must mean some tangible consequence of an adverse party's continued behavior, other than the alleged violation of the law." 65 Kan. App. 2d at 693.

The City first responds by asserting that the illegality of CoreCivic's proposed operation of the MRRC without a permit, standing alone, is sufficient to show irreparable harm. To support its position, the City cites K.S.A. 12-761(c), which provides that

16

"[w]henever any building or structure . . . is proposed to be . . . used in violation of any zoning regulations, the city . . . may institute injunction, mandamus, or other appropriate action or proceeding to prevent such unlawful . . . use or to correct or abate such violation." The City argues K.S.A. 12-761(c) "thus allows injunctive relief for *prospective* violations of a municipality's zoning ordinances, without any mention of requiring the municipality to establish some additional tangible injury flowing from the prospective violation."

K.S.A. 12-761(c) simply states that an injunction may be sought when a party proposes to violate zoning regulations; it does not lower the bar for a party to obtain injunctive relief. The statute does not state that a court may presume irreparable harm when it is asked to rule on a request for injunctive relief based on a proposed violation of zoning regulations. The absence of such a provision in the statute belies the City's contention that "threatened violations of zoning ordinances are sufficient injury in and of themselves to warrant injunctive relief." Thus, we reject the City's assertion that under K.S.A. 12-761(c), the prospective violation of its zoning ordinances alone constitutes irreparable harm for which the City could seek injunctive relief.

Alternatively, the City argues that even if the prospective violation of its zoning ordinances alone does not establish irreparable harm, the City identified several public health and safety issues the last time CoreCivic operated the facility as a jail and CoreCivic offered no evidence the harm would not recur if it was allowed to operate the facility again without a permit and some regulation by the City. The City asserts this evidence showed a reasonable probability that it would suffer tangible, irreparable harm without temporary injunctive relief. The record supports the City's contention.

In the City's memorandum supporting temporary injunctive relief, it described sewage spills and damage to the City's sewer system caused by CoreCivic's operation of

17

the facility as a jail. The City asserted that the MRRC was consistently understaffed. The conditions contributed to other problems "including beatings and stabbings of both prisoners and guards, unreported sexual assaults, widespread distribution of weapons, rampant suicides among detainees, denial of basic hygienic supplies and medical care, and doors that failed to consistently lock, forcing detainees to construct makeshift barricades to ensure their own safety." The City also asserted that "[a]ttempts by the Leavenworth Police Department to investigate crimes that had been reported inside the Facility were routinely stymied by CoreCivic and its policies." These contentions were supported by sworn testimony and documentary evidence. CoreCivic offered no evidence disputing the City's account of past problems with the facility, and it offered little evidence of any steps it would take to ensure the problems would not reoccur.

Patrick Kitchens, the City's Chief of Police, offered sworn testimony about CoreCivic's operation of the MRRC that is, to put it mildly, somewhat alarming. Kitchens testified that "the Leavenworth Police Department encountered many significant problems in responding to reports of crimes, including violent felonies, at the Facility. Due to frequent changes in leadership at CoreCivic, we had difficulty in getting these problems addressed." He testified that "[i]n one instance in November 2018, CoreCivic failed to report a death of an inmate to City Police for six days." He added that "[o]n three separate occasions, I recall receiving a voicemail from the warden following a sexual assault allegation" but it was clear CoreCivic "did not want any police investigation to occur." He also testified that CoreCivic "prohibited its employees who were victims of crimes from sitting for interviews with City police while the staff members were on duty. Instead, these crime victims were forced to provide a written statement through the holes of the Facility's fence and then follow up on their own time." Kitchens testified that if the facility were allowed to reopen, he had "serious concern about who would have operational responsibility over the Facility in the event of a serious situation, such as a riot, hostage situation, or escape that would endanger the citizens of Leavenworth."

18

CoreCivic asserts that "past harms do not constitute tangible irreparable harm" and cites *Weaver v. Beech Aircraft Corporation*, 180 Kan. 224, 228, 303 P.3d 159 (1956), to support this claim. But we have more than evidence of "past harms" to support the City's request for a temporary injunction. CoreCivic's actions demonstrate a very real and imminent harm; it intends to operate a detention facility, regardless of whether it has received a special use permit from the City. It did not dispute the City's account of past problems with the facility, and it offered little evidence of any steps it would take to ensure the problems would not recur except to assert in the declaration of its vice president that the facility "will be staffed with approximately 300 full-time employees with competitive pay and benefits." CoreCivic also maintained it was trying to negotiate an "impact fee" with the City and the Leavenworth Police Department. The substantial evidence of the City's problems with CoreCivic's operation of the facility combined with the minimal evidence the problems will be addressed supports a reasonable probability of irreparable harm. And like trying to put toothpaste back into the tube, the City would have little chance of overseeing the facility and regulating its operation once detainees were allowed to return to the MRRC under the control and supervision of CoreCivic.

Given the City's history of problems with CoreCivic's operation of the facility as a jail, it is reasonable that the City would not want CoreCivic to resume operations without obtaining a permit and without some regulation by the City. As the district court stated in its ruling, the City "must have the ability to regulate itself by enforcing its own laws." If CoreCivic were permitted to proceed as it intended, and the MRRC began operating without acquiring a permit and oversight from the City, there would be tangible consequences—not the least that actual detainees would begin to be held in the MRRC before the question of whether CoreCivic needed a permit was decided by the courts.

Kansas law requires a party seeking a temporary injunction to demonstrate a reasonable probability—not certainty—of irreparable future injury. The City sufficiently

19

showed that if CoreCivic were permitted to unilaterally reopen the MRRC without any permit or oversight by the City, there was a reasonable probability that the City would suffer irreparable harm. The district court did not base its ruling on an error of fact or law, as it did not simply presume that CoreCivic's violation of the ordinance would constitute an irreparable harm, but it based its decision on probable injuries the City would suffer without the issuance of injunctive relief. We conclude the district court did not abuse its discretion in finding that the City showed a reasonable probability that it would suffer irreparable harm in the absence of a temporary injunction.

*Adequate remedy, balance of harms, and public interest*

CoreCivic groups the last three factors a party must show to obtain temporary injunctive relief into one issue. First, CoreCivic contends the City failed to show that it lacked the ability to obtain an adequate remedy at law, arguing the district court's ruling was speculative and not supported by the evidence. Next, it asserts the district court's balancing of harms between the threatened injury and the proposed injunction was not supported by the evidence. Finally, it contends the district court's finding that a temporary injunction was not adverse to the public interest was not supported by the evidence.

First, as to the existence of an adequate remedy at law, the district court stated that it was "satisfied that the City has no adequate legal remedy due to the extreme difficulty of measuring damages that will accrue in the future, based on events that must first come to pass before the scope of damages can be assessed." As we already have discussed, K.S.A. 12-761(c) expressly authorizes a city to seek an injunction, in addition to other remedies, prohibiting a party from using land in violation of zoning regulations. See *Board of Seward County Comm'rs v. Navarro*, 35 Kan. App. 2d 744, 747, 133 P.3d 1283 (2006). Thus, the City was within its statutory right to petition for injunctive relief.

20

The City asserts that "[i]rreparable harm and the inadequacy of legal remedies are the same thing," and invites this court to clarify that Kansas law does not treat them as separate factors a party must show to obtain injunctive relief. We find it unnecessary to address this question because the record shows that money damages would have been an inadequate remedy for the injuries the City alleged would likely occur if CoreCivic were allowed to resume operating a detention facility without obtaining a permit and without regulation by the City. A court cannot put a price tag on public safety. We conclude the district court did not err in finding the City did not have an adequate remedy at law.

Turning to the balance of harms, there was sufficient evidence to support the district court's finding that the harm the City would experience if CoreCivic were not prevented from operating the MRRC without obtaining a permit outweighed the possible injury CoreCivic would suffer by entering a temporary injunction. As the district court noted, CoreCivic would simply be required to obtain a permit to operate its facility as a prison or jail—the same position any other company seeking to use its property in a manner that requires a special use permit. While the temporary injunction prohibits CoreCivic from receiving revenue from housing detainees, the record shows the facility has not been used for that purpose since 2021. Requiring CoreCivic to follow the City's Development Regulations is not a greater harm than the City could face if CoreCivic were permitted to proceed without any oversight from the City. The district court's finding under this factor was reasonable and supported by substantial evidence.

Finally, sufficient evidence supports the district court's finding that a temporary injunction would not be adverse to the public interest. The district court explained that "allowing CoreCivic to begin to house detainees without a proper determination on its permit status undermines the confidence and trust of the public in the City's ability to enforce its own regulations and ordinances." CoreCivic was not seeking a routine zoning variance from the City. Instead, it expressed its intention to reopen a facility that would

21

"house approximately 1,000 detained noncitizens" within the City. There is a clear benefit to the public of ensuring that CoreCivic's operation of the MRRC complies with all local regulations, which are implemented for the protection of the community. The district court's finding on this factor was reasonable and supported by the evidence.

In sum, applying the appropriate standards of review, we uphold the district court's order granting a temporary injunction in favor of the City. The City met its burden of showing all the necessary factors to obtain temporary injunctive relief. To the extent the district court's decision depended on findings of fact, those findings were supported by substantial evidence included with the City's motion for temporary injunction and supporting memorandum. To the extent the district court reviewed statutes, ordinances, and regulations, we have reviewed the same independently and find no error of law. We conclude the district court did not abuse its discretion in granting the City's request for a temporary injunction pending the final resolution of this dispute. The temporary injunction does not represent a determination of the outcome of the lawsuit and best preserves the status quo until a full decision can be made.

*Is CoreCivic entitled to damages?*

In granting the temporary injunction, the district court exercised its discretion under K.S.A. 60-905(b) and did not require the City to post a surety bond. CoreCivic does not challenge that ruling. But as its final claim on appeal, CoreCivic "seeks all damages arising out of the wrongfully issued temporary injunction, including attorneys' fees." The City asserts CoreCivic's request for an award of damages is not properly before the court. Since we find the district court did not err in granting the temporary injunction, CoreCivic is not entitled to recover damages or attorney fees.

Affirmed.